STEVENS ET AL. *v.* LEONARD, EXECUTOR, ET AL.

[No. 18,756.  Filed January 24, 1900.]

NEW TRIAL.—*Verdict Not Sustained by Sufficient Evidence* —That "the verdict is not sustained by sufficient evidence" is the proper and statutory cause for which a new trial may be demanded, and it is not necessary, in addition thereto separately to assign that "the verdict is contrary to the evidence." *p. 69.*

APPEAL.—*Evidence.*—*Weight Of.*—The Supreme Court will not review the evidence, where there was competent evidence to sustain the verdict. *pp. 70, 71.*

WILLS.—*Testamentary Capacity.*—The fact that the testator was, at the time of making his will, suffering great pain, did not take away his testamentary capacity. *p. 71.*

SAME.—*Undue Influence.*—*Trial.*—*Instruction.*—The complaint, in a suit to contest a will, charged that such will was invalid upon the ground of the unsoundness of mind of testator, and also for undue influence in the execution thereof. Upon the trial there was no evidence that the execution of the will was procured by undue influence. . *Held*, that it was not error for the court by proper instruction to withdraw from the jury the question of undue influence. *p. 71.*

WILLS.—*Undue Influence.*—The fact that some of the relatives ignored by a testator in his will were poor is of itself of little weight in determining whether undue influence was exercised over the testator. *p. 75.*

SAME.—*Subscribing Witness.*—*Instruction.*—An instruction that "a person who attaches his name as a witness to a testamentary instrument impliedly certifies that the testator is of sound mind, and while the law will subsequently permit him to testify to the contrary, because the truth, if such it be, should be learned, yet the jury trying the case may consider the fact of such implied contradiction in weighing his testimony," is a correct statement of the law, and is not an invasion of the province of the jury. *pp. 76–79.*

SAME.—*Undue Influence.*—*Evidence.*—Where, on the trial of an action to contest a will, it was contended by plaintiff that the testator's antipathy for his brother was without substantial foundation, but was due to an insane delusion, it was proper to admit evidence in contradiction thereof showing that such brother had stated to a crowd that testator in his lifetime had improved every opportunity to take advantage of his brothers, and had robbed them, although it was not shown that testator had knowledge of such statement before making his will. *pp. 80, 81.*

EVIDENCE.—*Expert Testimony.*—*Unsoundness of Mind.*—On the trial of an action to contest a will, on the ground that the testator was a person of unsound mind, a physician shown to possess the necessary qualifications of an expert, was asked the question whether or not from his conversation with and examination of testator at a time specified, such testator "was laboring under an insane delusion or anything of that kind." To which question the witness answered in the negative. *Held,* that the answer was not objectionable as being a statement of fact, and not the expression of an opinion. *p. 82.*

TRIAL.—*Misconduct of Juror.*—*Appeal.*—Where the question of alleged misconduct of a juror was tried in the court below upon affidavits and counter affidavits, it will be presumed on appeal that the decision of the trial court was correct. *p. 82.*

From the Lake Circuit Court. *Affirmed.*

*N. L. Agnew, D. E. Kelly, E. D. Crumpacker* and *J. B. Peterson,* for appellants.

*A. C. Harris, A. D. Bartholomew, J. W. Youche, B. K. Elliott, W. F. Elliott* and *F. L. Littleton,* for appellees.

DOWLING, J.—Joseph Leonard died June 5, 1895, leaving no wife or child. His heirs at law were his three

brothers, James, Alvah, and John, and the children of a deceased sister, to wit, Lewis W. Stevens, William Stevens, Clara DeMotte, Eva Finney and Elizabeth Finney. On the 10th day of June, 1895, a paper purporting to be the last will of the said Joseph Leonard, bearing date of December 13, 1888, was presented to, and admitted to probate in, the Porter Circuit Court, of Porter county, Indiana, which was then in session. Afterwards, on the 25th day of March, 1896, the appellants filed their complaint to contest the said will, alleging unsoundness of the mind of the said Joseph Leonard, and the undue execution of the will. There was a further allegation that a subsequent will had been executed by the said Joseph Leonard revoking the former will, but this ground was abandoned by the contestors and requires no further notice. The statutory requirements as to the verification of the complaint, and the execution of an undertaking for costs were complied with. The appellees appeared and answered. After the commencement of the action, John Leonard, one of the brothers, died, and John Brodie, as the administrator of his estate, together with the widow and children of the said John Leonard were by a supplemental complaint, made defendants in the place of the said John. On the application of the appellants, the venue of the cause was changed to Lake county, the case was tried by a jury, and a general verdict was returned sustaining the will. A motion for a new trial was overruled, and the court rendered judgment on the verdict. The only error assigned is the overruling of the motion for a new trial.

The first cause for which a new trial was claimed was that the verdict was contrary to the evidence; and the second, that the verdict was not sustained by sufficient evidence. The latter is the proper and statutory cause for which a new trial may be demanded, and, when stated, it is not necessary to allege that the verdict is contrary to the evidence. A verdict which is contrary to the evidence is correctly de-

scribed in the motion for a new trial in the language of the statute, as not sustained by sufficient evidence.

The first proposition in the argument for the appellants is that Joseph Leonard made his will under a delusion concerning the character and conduct of his brother Alvah. The complaint and answer made the question of the soundness or unsoundness of the mind of Joseph Leonard, at the time of the execution of the will, an issue in the cause. Hundreds of pages of evidence in the record exhibit the conflicting facts and opinions of the witnesses called to support, and to combat, the averment of mental infirmity. The question tried and determined by the jury was not whether Alvah Leonard was a rogue, a hypocrite, and a cheat, nor whether the aversion manifested by Joseph Leonard toward his sister's children was justifiable, or well or ill-founded, but whether Joseph was of sound mind when he executed his will. To maintain the issue on the part of appellants, the manifestation of bitter and unnatural sentiments by Joseph Leonard against his brother Alvah was shown, and there was evidence of expressions of unkind feeling toward his sister's children. But this proof was met by testimony, that these sentiments and feelings were not the result of insane delusions, but that they had their origin in real grievances, and apparent slights. The existence of intense and implacable resentments is not incompatible with entire soundness of understanding; and trivial instances of disrespect may create aversion and dislike in a mind which is either sensitive or exacting and imperious. All these facts were before the jury, and, after long deliberation, they arrived at the conclusion that Joseph Leonard was not of unsound mind when he made his will. In our opinion, the evidence entirely fails to show that the feelings of Joseph Leonard toward his brother Alvah, and the children of his deceased sister, were the result of insane delusions or hallucinations. The deceased was evidently a man of coarse but vigorous mind, of strong will, illiterate, and unrefined. His prejudices were

violent, perhaps unjust and excessive, but we find no support in the evidence for the allegation of the complaint that his mind was unsound, and that he was incapable of disposing of his estate by will. It is not within the province of this court to weigh the evidence, and even where the preponderance against the finding or verdict is apparent and great, we cannot, under the oft repeated rule of decision by which we are governed, disturb the conclusions of the court or jury. The circumstance that the supposed testator was, at the time of the execution of the will, suffering from acute pain, did not take away his testamentary capacity. *Torrey* v. *Blair*, 75 Me. 548. The evidence, in our opinion, fully sustains the verdict, and the court did not err in refusing to grant a new trial on account of the alleged insufficiency of the proof.

The appellants next complain that the court erred in giving instruction numbered one, which was in these words: "There is no evidence to show that the testamentary instrument in question was not, in the matter of forms gone through with, in all respects duly executed. I do not withdraw from your consideration, if you deem it important, any proof as to the extraneous influences, if any, which operated on the mind of the testator, if they did so operate, but, upon the condition of the evidence in this case, I instruct you that such influences, if any, can only be considered upon the question as to whether the testator was of unsound mind. There is, therefore, but one ultimate question for your consideration under the facts in this case, and that is, was the testator at the time he signed the testamentary disposition of his property, now in contest, so far of unsound mind as to invalidate the document which has been probated as his will?"

Counsel say in their brief: "Of course, it is at once to be perceived that this instruction takes out of the record, as it is intended to do, the question of undue influence. This was a question upon which the appellants relied, and now

insist that the court erred in withdrawing the question from the jury. The same question is presented in instruction number ten, asked for by the appellants (page sixty-one of the record) which is as follows: 'If you believe from the evidence that at the time of making the will in question, and for several years prior thereto, Joseph Leonard was in poor health, and in a condition of nervousness and excitability, and if you further believe that during that time James Leonard, one of the defendants, took advantage of his enfeebled condition, and by words and insinuations poisoned the mind of the said Joseph Leonard against his brother Alvah, to such an extent that said Joseph possessed an intense hatred of his said brother, and was induced by said hatred to give all his property to James and his family by will, said will is invalid and should be set aside.' "

If there was evidence that the execution of the will was procured by the exercise of undue influence, then the instruction given was erroneous, because it withdrew from the consideration of the jury that element of the case. If there was no evidence of undue influence, the direction of the court was right. The burden of proof was upon the appellants, and, if the evidence in the cause entirely failed to sustain any one of the grounds upon which the validity of the will was assailed, the court had the right to withdraw the consideration of such ground, and to instruct the jury to disregard it. *Faris* v. *Hoberg*, 134 Ind. 269; *Ohio, etc., R. Co.* v. *Dunn*, 138 Ind. 18; *Palmer* v. *Chicago, etc., R. Co.*, 112 Ind. 250.

It is necessary, therefore, to ascertain what constitutes undue influence within the meaning of the law, and then to determine whether there was any evidence of such undue influence before the court and jury. "Undue influence has been defined, as that which compels the testator to do that which is against his will, through fear, or the desire of peace, or some feeling which he is unable to resist, and 'but for which the will would not have been made as it was.' " Red-

field Law of Wills (4th ed.), p. 530; 27 Am. & Eng. Ency. of Law, p. 495, and notes. Again, it is said that, "the influence must be undue, in order to vitiate the instrument, because influences of one kind or another surround every rational being, and operate necessarily in determining his course of conduct under every relation of life. Within due and reasonable limits such influence affords no ground of legal objection to his acts. Hence mere passion and prejudice, the influence of peculiar religious or secular training, of personal associations, of opinions, right or wrong, imbibed in the natural course of one's experience and contact with society, cannot be set up as undue to defeat a will, if, indeed, it were possible to gauge the depth of such influences at all. 'It is extremely difficult,' as Lord Cranworth has observed, 'to state in the abstract what acts will constitute undue influence in questions of this nature. It is sufficient to say, that, allowing a fair latitude of construction, they must range themselves under one or other of these heads—coercion or fraud.' Not even can the circumstance that the influence gained by one individual over another was very great, be treated as undue in our present connection; especially if the person influenced had free opportunity and strength of mind sufficient to select what influences should guide him, and was in the full sense legally and morally a responsible being." Schouler on Wills, §227; *Boyse* v. *Rossborough*, 6 H. L. Cas. 2; *Wingrove* v. *Wingrove*, 11 Prob. Div. 81.

The American editor of Jarman on Wills in an exhaustive note on the subject of undue influence states the law thus: "The test to be applied is agreed to be this: Was such influence brought to bear as to take away, that is, did it take away, the supposed testator's free agency, in this instance? * * * Unfree agency in a case of undue influence is simply this: The apparent testator is but the instrument by which the mastering desire of another is expressed; the supposed will, or the particular part in question, is not the will of the supposed testator except in the sense that he has

consented to put his name to the instrument in the form in which it appears. Of course yielding to influence is consistent with free agency; agency is free in the eye of the law, however much the agent is influenced by other men until the influence amounts to domination of the will. Thus, persuasion and argument are not improper, so long as they do not overcome free agency." 1 Jarman on Wills (note), p. 66; *Dale's Appeal,* 57 Conn.. 127.

We have been unable to find in the great mass of testimony in this case any evidence of the existence of undue influence, or its exercise upon the mind or sensibility of the deceased in connection with the disposition of his estate by his will. In the course of his dealings with his brother Alvah, extending through many years, he had formed an unfavorable opinion of his character, and he cherished a feeling of resentment against him. These sentiments were shared by James Leonard, the brother to whom the estate was devised, and, when the conduct of Alvah was the subject of conversation between the brothers, James freely expressed his antipathy to Alvah. It does not appear that the disposition of the property of the deceased was ever mentioned by James, or that James attempted to influence his brother Joseph in any way concerning such disposition. It was not shown that he advised Joseph to make a will, and it was proved that he was ignorant of the fact that a will had been made, until January 5, 1895, some six years after its execution. The deceased, during his life, manifested but little affection for the children of his sister, and their habits and behavior were severely commented on by him. But these impressions were the result of his own observation and experience, and there was no evidence that they had been artfully or wrongfully created by another, who wished thereby to influence the mind of the deceased, and to divert from any of these relatives such portion of his estate as the deceased would otherwise have bestowed upon them. It cannot be said that the disposition made of his estate by the

deceased was an unnatural one. He had neither wife nor child, so that his property, if not disposed of by will, would have been scattered among collateral relatives. He had the right to favor those whom he loved and trusted, and from whom he had received nothing but respect and kindness, and to disappoint the expectations of other relatives who had, justly or unjustly, incurred his ill-will or aversion. The fact that some of the relatives of the deceased were needy, is, of itself, entitled to little weight.

In *Goodbar* v. *Lidikey*, 136 Ind. 1, this court said, on p. 6: "Indeed, we think that the presumption in favor of the validity of a will should be increased rather than diminished from the circumstance that a bequest was made to one with whom the testator had maintained intimate and confidential relations during life. A will, in fact, is usually made in order to give property to those whom the testator desires to favor. If it were the desire that the property should go in due proportions to those equally related to the testator, then no will would be necessary. The law itself would make such distribution in the most equitable manner possible. This is particularly the case where, as in this case, the testator had neither wife nor children, and his property, if not devised, would go to collateral relations."

There was no evidence whatever that the deceased was, by any means, constrained to do what was against his will, and what he would not do if left to himself. There was here neither coercion nor fraud. The will of the deceased faithfully reflected *his* desires, *his* passions, *his* prejudices, and not the desires, passions, or prejudices of another. He kept it by him for more than six years, and his purposes, as expressed in the will, remained steadfast during all that time. When his life and strength were ebbing away, he spoke of his will but intimated no inclination to alter or revoke it. Under this state of the evidence, the duty of the court was clear, and it did right in withdrawing from the jury the question of undue influence.

The third point made by counsel for appellants is that the court erred in giving to the jury instruction numbered fifteen, in these words: "A person who attaches his name as a witness to a testamentary instrument impliedly certifies that the testator is of sound mind and competent to make a will; and while the law will subsequently permit him to testify to the contrary, because the truth, if such it be, should be learned, yet the jury trying the case may consider the fact of such implied contradiction in weighing his testimony."

It is said by counsel that "this instruction is erroneous, first, because it does not state the law correctly, and second, even if it is correct in the abstract, it usurps the province of the jury in determining a question of fact, and in passing upon the credibility of a witness of which the jury is the exclusive judge." While it is not necessary to the validity of a will that the subscribing witnesses should know that the instrument they attest is a will, yet, in the absence of proof to the contrary, they will be presumed to have had such knowledge when they attested it. The view of the law contained in the above instruction is sanctioned by very high authority. In *Schribner* v. *Crane*, 2 Paige 147, Chancellor Walworth said: "No person is justified in putting his name as a subscribing witness to a will, unless he knows from the testator himself that he understands what he is doing. The witness should also be satisfied, from his own knowledge of the state of the testator's mental capacity, that he is of sound and disposing mind and memory. By placing his name to the instrument, the witness, in effect, certifies to his knowledge of the mental capacity of the testator; and that the will was executed by him freely and understandingly, with a full knowledge of its contents. Such is the legal effect of the signature of the witness when he is dead, or is out of the jurisdiction of the court."

"It seems to be supposed" says Judge Redfield, "that they [the subscribing witnesses to a will] are only witnesses to

the act of signing. But when it is considered that the witnesses to a will must certify to the capacity of the testator, as well as to the act of execution, the transaction begins to assume a somewhat different aspect. One who puts his name as a witness to the execution of a will, while he was conscious that the testator was not in the possession of his mental faculties, places himself very much in the same attitude as if he had subscribed, as witness, to a will which he knew to be a forgery, which every honorable man could only regard as becoming accessory to the crime by which the will was fabricated; so that it is not improbable that the want of proper appreciation of the discredit resulting from the act of becoming a witness to the execution of a will, by one confessedly incompetent to the proper understanding of the instrument, may, and probably does, result chiefly, with us, from the general misapprehension of the law upon the subject, rather than from any settled disposition to disregard its dictates if correctly understood." 1 Redfield on Wills (note), p. 96.

Lord Camden early pointed out how peculiar a stress the statute of frauds had laid upon the quality and office of the witnesses to a will as distinguished from other transactions. He says: "And the only question that can be asked in this case is, was the testator in his senses when he made it? And consequently, the time of execution is the critical minute that requires guard and protection. Here you see the reason why witnesses are called in so emphatically. * * * Who then shall secure the testator in this important moment from imposition? Who shall protect the heir at law, and give the world a satisfactory evidence that he was sane? The statute says, three credible witnesses. What is their employment? I say, to inspect and judge of the testator's sanity before they attest." *Hindson* v. *Kersey,* 4 Burn's Eccl. Law 119.

In *Tatham* v. *Wright,* 2 Russ. & My. 1, where two subscribing witnesses had declared that they would testify against the testator's capacity, Tindal, C. J., made this severe

comment: "The real question is, whether these witnesses are to be believed upon this evidence in contradiction to their own solemn act in the attestation.. * * * That is the problem to be solved."

A writer of great authority says: "The signature of an attesting witness, when proved, is evidence of everything upon the face of the instrument, for it is to be presumed that the witness would not have subscribed his name in attestation of that which did not take place; and where there are several attesting witnesses, all of whom are accounted for, proof of the handwriting of any one is sufficient without proving that of the rest." Starkie on Ev., (10th Am. ed.), p. 519.

The same author says, elsewhere: "The law requires the testimony of the subscribing witness, because the parties themselves, by selecting him as the witness, have mutually agreed to rest upon his testimony in proof of the execution of the instrument, and of the circumstances which then took place, and because he knows those facts which are probably unknown to others." Starkie on Ev. (10th Am. ed.), p. 504; Chaplin on Wills 92.

In Schouler on Wills, §181, this sensible observation is found: "One should only subscribe as witness when he can conscientiously testify without reserve in favor of the will, and its proper execution; and it is for the true interest of every rational testator to procure witnesses who will stand resolutely by the transaction against all insidious or open opposition to the probate." *Pence* v. *Waugh,* 135 Ind. 143, 155.

It cannot be thought possible that an honest man, of ordinary intelligence, would subscribe his name as a witness to an instrument executed by a person whom he believed to be of unsound mind, or under coercion or constraint. The fact that such a man voluntarily identifies himself with the transaction as a witness is an indication that, in his opinion, the person executing the instrument is competent to do so. The

witness must be understood to attest not merely the act
of signing, but also the mental capacity of the testator to
sign.   A subscribing witness may, it is true, be heard to
impeach the will; but, if he assumes that attitude toward it,
he does so at the peril of his reputation for candor and
veracity.   Such an attitude is not merely inconsistent with
the position he has voluntarily taken, but is suggestive of
fraud and double dealing.   It involves a betrayal of confi-
dence, and, if the witness is believed, in some instances, it
may be attended with the most distressing consequences.
The credibility of the witness becomes at once a matter of
serious inquiry, and his desertion of his position as a sus-
taining witness is an important fact for the consideration of
the jury.   In such a case, it is entirely proper for the court
to inform the jury that they may consider the fact of such
implied contradiction, if they find that it exists, in weighing
his testimony.   A direction of this character is not an inva-
sion of the province of the jury; nor is it objectionable on
the ground that it singles out a witness for attack or criti-
cism.   It is the duty of the court, in all cases, to instruct the
jury upon the law of the case, whether the testimony of one
witness or the testimony of a score of witnesses is compre-
hended within the rules necessary to be stated for their
guidance.

In the instruction under examination, the court did noth-
ing more than declare, as it was competent for it to do, a
familiar rule of law, leaving the application of it entirely to
the jury, and without giving them to understand what his
own opinion on the subject was.   *Commonwealth* v. *Self-
ridge*, 1 Horr. & Thompson Cases on Self Defense 1.

"The court should not express any opinion on the *weight*
of evidence, nor on the credibility of particular witnesses.
*   *   *   But general rules for weighing and reconciling
the evidence, and as to what the jury *may* consider in deter-
mining the credibility of witnesses, so long as the court does
not trench upon the province of the jury, may properly be

given in almost every case." Elliott's Gen. Pr., §901, and cases cited in note 1.

Undue prominence was not given in this instruction to any particular portion of the evidence, nor was the attention of the jury directed to an isolated and prominent feature of the testimony in such a manner as to mislead them, or indicate the opinion or bias of the court, to the injury of the appellants. The wholesome rules stated in the cases referred to by counsel for appellants were not violated, nor did the court in any respect usurp the functions of the jury. There was no dispute as to the fact that one of the subscribing witnesses was called by appellants, and that his testimony tended to impeach the will. The court might, with propriety, have said much more than it did; it could not, in justice to the parties, have said less, or stated an indisputable rule more fairly. *Paris* v. *Strong*, 51 Ind. 339; *Stanley* v. *Montgomery*, 102 Ind. 102; *Union, etc., Co.* v. *Buchanan*, 100 Ind. 63, 81; *Finch* v. *Bergins*, 89 Ind. 360; *Cheatham* v. *Hatcher*, 30 Gratt. (Va.), 56; 25 Am. & Eng. Ency. of Law, 1017, note 2; 29 Am. & Eng. Ency. of Law, 203, note 1.

In connection with instruction numbered fifteen, the court, by instruction numbered seventeen, clearly admonished the jury that they were the exclusive judges of the weight of the evidence, and that the court had no right to invade their province of determining what the evidence proved. They were further told that they had the right to decide upon the credibility of each witness. In the light of the authorities which we have cited, it is evident that the jury were properly instructed, and that there was no error in this part of the proceedings of the court.

It was also assigned, as a ground for a new trial, that the court permitted the following evidence to be given to the jury over the objection of the appellants: "Q. State what, if anything, he [Alvah] was saying to the crowd about the conduct of his brother Joseph in that partnership transac-

Stevens *v.* Leonard, Ex.

tion? A. Mr. Leonard said that his brother Joseph had had an opportunity to take advantage of the other brothers, and that he improved every opportunity, right and left, and that he had robbed the other brothers of what was justly due them, and a variety of expressions of that sort, and he seemed very much excited about the matter, and talked in rather a loud tone of voice for him."

It is objected that this evidence was inadmissible for any purpose, but we cannot so regard it. The theory of the appellants was that the unfriendly feelings entertained by the deceased toward his brother Alvah were the result of mere delusions of fancy, and were without substantial foundation in point of fact. Much testimony was introduced by appellants to show the existence of these unnatural sentiments, and on the other hand the appellees undertook to account for them by proving that Alvah's conduct in various business transactions had created enmity between him and Joseph. The actual state of the relations between Alvah and Joseph, therefore, became a material fact in the case, and proof that Alvah reciprocated the feelings of distrust and dislike cherished by his brother Joseph, and that he publicly denounced Joseph as a dishonest and unscrupulous man, was entitled to some weight upon the question whether Joseph's aversion for Alvah was but the hallucination of an enfeebled or distracted mind. It was not necessary, in our judgment, for the appellees to show that the accusations made by Alvah came to the knowledge of Joseph before the latter made his will. The state of Joseph's feelings toward Alvah was established. The attitude of Alvah toward Joseph was an important factor in the investigation of the question whether Joseph's dislike of Alvah was natural or unnatural; whether it sprang from a collision of views and interests in real transactions, or was the offspring of a mental malady. We think the evidence was properly admitted, and that, as an indirect and collateral fact, it had a tendency

to establish the reasonableness of the conduct and sentiments of Joseph Leonard toward his brother Alvah.

In the next place, the appellants complain of the answer of Dr. Beer, an expert, to a question touching the mental condition of the deceased. The question and answer were as follows: "Q. Now, Doctor, let me ask you this question. Whether from your conversation with him, and from an examination of him, his appearance, and everything at that time, whether Joseph Leonard, on the 12th day of December [the date of the will] was or was not laboring under an insane delusion, or anything of that kind?" To which question the witness answered: "No, he was not." Appellants excepted to this question and answer. The objection is made that the answer of the witness is the statement of a fact, and not the expression of an opinion. This construction of the answer seems to us entirely without warrant. The witness having been shown to possess the requisite qualifications of an expert, and having seen, conversed with, and examined the supposed testator, was authorized by the rule of evidence applicable in such cases to express his opinion as to the soundness of the mind of the deceased. His answer was in the usual form, and could not have been undertsood by the court or jury as anything more than an opinion, as all such evidence in inquisitions of this character must necessarily be. There was no error in the action of the court upon the exception to this evidence.

The last alleged error discussed by counsel for appellants is the refusal of the court to set aside the verdict because of the supposed misconduct of one of the jurors. This question, however, was tried in the court below upon affidavits and counter-affidavits, and we must presume, in the absence of a very clear showing to the contrary, that the decision of the trial court was correct. It is proper to add that the record shows that the affidavit filed in support of appellant's motion was made upon information only, and that it was directly contradicted not only by the affidavit of the juror,

but also by the affidavit of the person from whom the pretended information was alleged to have been derived.

Other errors are assigned, but as they are not discussed by counsel for appellants, they must be treated as waived. Finding no available error in the record, the judgment is affirmed.