[No. 31946.   Department One.   October 23, 1952.]

*In the Matter of the Estate of* CHARLES E. MITCHELL, *Deceased.*

C. B. MITCHELL *et al., Respondents,* v. LAURA DALING, *Individually and as Executrix, et al., Appellants,* RALPH H. MITCHELL *et al., Defendants.*[1]

[1]Reported in 249 P. (2d) 385.

*Frank B. Malloy* and *Shiner & Arneil*, for appellants.

*Ned W. Kimball* (*Joseph P. Tully*, of counsel), for respondents.

DONWORTH, J.—This is a will contest brought by two sons of Charles E. Mitchell, who died June 21, 1950, at the age of ninety-three, of arteriosclerotic gangrene in his right leg. The antecedent cause of death was stated in the death certificate as "generalized arteriosclerosis," and the interval between onset and death as "years." Defendants are the other living children of Charles E. Mitchell, to wit, two daughters and two sons, and Gale W. Mitchell, son of a deceased child.

Only the two daughters, Laura Daling (individually and as executrix of the estate of her deceased father) and Ethel Heath answered plaintiffs' petition. The issues made by the pleadings were:

1. On June 22, 1948, the date the purported will was executed, was Charles E. Mitchell of sound and disposing mind and memory and competent to execute a will?

2. Was the purported will executed as the free and voluntary act of Charles E. Mitchell, or was it executed as the result of undue influence exerted by Ethel Heath?

The cause was tried to the court sitting without a jury. At the close of the evidence the court gave its oral decision that the purported will should be set aside. Findings of fact, conclusions of law and a judgment setting aside the will were subsequently entered. From this judgment defendants Daling and Heath have appealed.

The record is a lengthy one, and the testimony relative to the mental competency of the deceased is conflicting, but, essentially, the following facts appear not to be controverted:

Charles E. Mitchell was a pioneer wheat rancher in Douglas county. He resided on a ranch near Farmer, Washington, prior and subsequent to 1909 and raised a large family consisting of five sons and two daughters. His wife died in 1909. All of the children worked hard on the ranch while living there. Ethel, Laura, C. B. (Bud) and Cecil attended school and lived in Waterville for various lengths of time after 1909, but during vacation periods worked on the ranch. Horace and Edgar were young men in 1909 and worked for their father on the ranch.

On October 30, 1914, Charles E. Mitchell deeded to Edgar, one of the contestants, a half section of land. The deed recited a consideration of twelve thousand dollars. On the same date, he conveyed to Horace a quarter section by a deed which recited a consideration of six thousand dollars. At some time prior to January 18, 1916, he delivered to Horace the sum of five thousand dollars with which Horace purchased an adjoining quarter section, thus acquiring a half section in all.

By deed dated December 24, 1918, which recited a consideration of one dollar, the deceased conveyed to C. B. Mitchell, the other contestant here, a half section of land. Decedent also had a well drilled and built a house on the land for his son. In 1919 or 1920, he gave to Ralph H. Mitchell, the oldest son, ten thousand dollars. In 1926, by a

deed, which recited a consideration of one dollar, he conveyed to Cecil Mitchell (now deceased), who was the father of Gale W. Mitchell, a half section of land. It appears that the lands conveyed were, at the time of conveyance, reasonably worth ten thousand dollars per half section.

It is disputed whether some of these various transactions represented gifts by the deceased to his sons or whether they furnished adequate consideration either in cash or labor. We are of the opinion, however, that it is necessary only to determine whether Charles E. Mitchell might reasonably have considered that these various deeds were gifts to his children.

It is not disputed that the ten thousand dollars was an outright gift to Ralph H. Mitchell. The evidence conclusively established also that the conveyance to C. B. Mitchell was largely, if not entirely, a gift. There is no clear evidence bearing upon the deed to Cecil, and we shall assume that it was not an outright gift but arose from an agreement similar to that which Edgar and Horace testified they had with their father, which we shall now examine.

Until 1912, Horace and Edgar worked for their father on the ranch and were paid five hundred dollars per year as wages. In that year, they entered into an oral agreement with their father, the terms of which are not definitely stated. As nearly as we can gather from the record the agreement was that, in order to provide his sons with ranches of their own, the deceased would pledge his credit to buy a section of land; the sons would no longer be paid wages, but all would work together on all the land (including that already owned by the deceased) until the earnings from all the land were sufficient to pay for the newly acquired section; and when the land was thus paid for, the deceased would convey to Edgar and Horace a half section each. This agreement was carried out with the exception that Horace received five thousand dollars with which to acquire the rest of his half section derived from the agreement. According to the testimony of Edgar, the rise in wheat prices which occurred after the beginning of World War I enabled them to pay for the new land with the pro-

ceeds from the sale of but one crop, being that harvested in 1914.

It was Horace's recollection that the land was not paid for until about 1916, but the deeds, being dated October 30, 1914, tend to bear out Edgar's testimony.

It thus appears that in two years' time Edgar and Horace, who had previously been paid only five hundred dollars per year as farm laborers, became possessed of estates worth at least ten thousand dollars each. This came partly from their own labor, their father's pledge of his credit and the earnings from all the land, including that owned by their father. The father at all times collected the proceeds from the crops raised on the land and, under the evidence, it is a matter of speculation as to what the value of the sons' contribution to the purchase of the land was.

Edgar testified at the trial that he had paid for the land from its earnings. Horace testified as follows:

"Q. Horace, this property that you have received from your father you feel that you earned that, don't you? A. Yes, I did. Q. In other words you stated that it was in compensation for your staying home and working, isn't that right? A. That's right. Q. And so that when it is attempted to be made to appear that your father just out and out handed you a half section of land, that isn't the actual case, is it? A. No, it wasn't a gift like it was to some of the rest of the family. Q. In other words as far as your assets are concerned you earned them? A. *I earned a good share of them.*" (Italics ours.)

The two daughters (appellants) were emphatically of the belief that the deeds to all the boys were outright gifts from their father. Ralph H. Mitchell, testifying on behalf of appellants and against his own pecuniary interest, stated that from his own observation and "to his own satisfaction" the deeds represented gifts to the other sons. In response to a question asked by the court, he testified as follows:

"Well, I couldn't say that I was right there and saw them do this and so on because I wasn't there. The fact that they were even deeded this land, that was a general understanding of the family that it was just a nominal consideration and that they establish themselves on this land and build

up their homes on it. Generally, the understanding about dad's disposition was to equalize his assets with his family."

After considering all the testimony relating to these land transactions, we are of the opinion that Charles E. Mitchell could very reasonably have considered that he was responsible for establishing his sons as ranchers on a half section of land each and that the land was in effect a gift from him.

At some time shortly after the close of World War I, his daughter Ethel Heath, who had by then married and was residing in Leavenworth, Washington, wrote her father asking that he make a similar provision for her. Her testimony relative to this letter is as follows:

"A. There was a time when I felt that my—when my family was young I was having as hard a time as the boys and I did write him a letter and explain the situation to him that he had come right down the line. He had taken care of all of them. He come to Bud and he had taken care of him so generously and when he came to me he skipped over me and came to my next brother, Cecil, and he took care of him and so I wrote him, well, just a fairly decent letter and I asked him why that was. I said that your boys, all except Cecil never contributed anything to their country in a military way; they reaped the profits of war and all that and stayed home and had the security. And Cecil of course did go and I said my husband went out and other young men did too. I said I don't see why—that I am a child, too. And it was community property. My mother lived on that land with her children and he went away off to Walla Walla and worked. And the Indians were raving around there and it was a dangerous proposition and she took that responsibility. I felt that I had as great an interest as the boys did. Q. As a matter of fact your father never forgave you for writing that letter, did he? A. Oh, yes he got over that. It hurt him, I admit. I think it hurt him a little bit. It put him to thinking and that is what he needed because in our family the women never amounted to anything. They were always pushed in the background and the men had—were the big cheese. They handled the money and spent it any way they wanted to. Q. In your father's disposition he thought you were impudent? A. What? Q. He thought you were impudent when you wrote that letter? A. He didn't say so. I went home shortly after that and shook hands with him and visited with him. I couldn't say how long that was,

probably a few months later when I went home. Q. He didn't offer you a half section of ground, did he? A. Pardon. Q. He didn't offer you a half section of ground? A. No. Nobody suggested anything about anything. Q. Did he at any time after that letter give you anything? A. Yes, he did. He gave me a thousand dollar bond. Q. Did he, while you were living in Leavenworth, loan you any money? A. Yes, but that is when we got this thousand dollar bond when we lived at Leavenworth. I built a dairy barn with it. Q. Now, Mrs. Heath, you have testified that the property which he gave to the boys was community property which your mother had acquired, is that right? A. That's right. Of course when mother passed away there was a Will signed. It was given to my father because property like that you couldn't hand to a child. It would have to be in a trust fund or something like that. So she deeded it all to him. Q. In other words— A. I heard my mother tell him one time that if there was any distribution of property that she wanted things divided up fairly because in her Will—in her family she had had only brothers and she seemed to think that the brothers got away with everything and my mother was quite conscience—conscious of that. I heard her tell him that she wanted things in her family divided up fairly. Of course it was in his discrimination to decide what fairly was of course. Q. And at least until you got him over at your house he never saw fit to give you anything as a matter of fact in fairness, did he? A. Well, a thousand dollar bond that I built the barn with. Q. Outside of that? A. That is all I ever got from him."

Charles E. Mitchell acquired considerable wealth during World War I when wheat prices were high. Most of this wealth was in the form of bank deposits. He lost heavily in the bank failures of the early 1930's and his assets were thereafter greatly reduced.

At least by 1930 it appears that all of his children had married and were established in homes of their own, and Charles E. Mitchell thereafter, until 1942, resided alone at his ranch. He was eighty-six years old in 1942. His children called on him frequently and looked after him in various ways, such as by getting mail and groceries for him and performing other errands.

In late 1942, or early 1943, he underwent an operation in

Spokane for prostate gland trouble. C. B. Mitchell took his father to Spokane, and according to his testimony, inquired of his father if he had made a will, to which his father is stated to have replied:

"No, I haven't . . . I have thought about it, but I have just not definitely made up my mind. I don't know whether I will have anything to Will. If I have why it can be — the law will distribute it to the rightful heirs equally so I am not going to make any Will."

C. B. Mitchell further testified that his father expressed extreme impatience to be released from the hospital after the operation, that he was released within a few days, that he lived at the home of the witness for about six months thereafter, that he was thoroughly confused for the first three months and "was a hospital case" and that he did not know where he was. The witness also testified that during the next four years he observed that his father became more forgetful, irritable, feeble, untidy and dirty. None of the other witnesses testified to such a change in the testator during the period from 1943 to 1947.

Beginning with the winter of 1943-1944, the testator lived with his daughter, appellant Daling, from October or November until April or May of each year. In the summer and fall, he lived alone at his ranch. He was no longer actively farming, having leased his land in 1943 to his grandson, Stanley Mitchell, a son of Edgar Mitchell, for a period of four years. Under the terms of the lease, the testator received as rent one fourth of the crop.

On the morning of October 24, 1947, C. B. and Stanley Mitchell called on the testator. They found him on the floor under his bed. His speech was rambling and he did not know where he was. He was cold. It is not known how long he had lain in that position, but the consensus of opinion is that, since he was partly undressed as if preparing for bed, he had been there all night. The two men built a fire, gave him a drink of whiskey and hot water and called a doctor and Mrs. Daling. The doctor examined him briefly and ordered him taken to a hospital in Wenatchee.

The doctor who cared for the deceased while a patient at St. Anthony Hospital in Wenatchee diagnosed his condition as "senile-arterio sclerosis." For the first few days in the hospital it appears that the deceased was voluble, rambling in his talk, restless and occasionally irrational. His condition improved, however, and he asked to be taken home. He knew where he was, where he lived, and that he wanted to get out of the hospital as quickly as possible. When he was discharged from the hospital on November 22, 1947, his chart stated that he had improved, although the doctor's final diagnosis was "senile-arteriosclerosis" and prognosis "poor."

While he was in the hospital Horace and C. B. Mitchell prepared, or caused to be prepared, a power of attorney which the deceased executed on November 7, 1947. Appellant Daling was thereby given a general power of attorney to transact all business for the deceased.

The testimony of respondents and appellants as to the mental condition of the deceased while in the hospital and thereafter during the two years and five months prior to his last illness, which began in March, 1950, is in direct conflict.

Appellants picture their father during this period as an elderly gentleman who, while confined to a wheel chair and suffering from arthritic pains, read current magazines and daily newspapers and discussed them intelligently with members of the household. He was able to recognize and converse with relatives and friends who came to visit him. He could walk a short distance in the house by holding onto pieces of furniture. He could dress himself except that he needed assistance in buttoning his clothing. He was not senile and for a man of ninety-two was in reasonably good health physically and mentally.

Respondents, on the other hand, testified that during this period their father either talked incoherently or did not converse at all. He was unable to recognize his own sons or one of his daughters when they visited him. He could not remember one of his sons a short interval after he had told

his father who he was. His arms and legs were much thinner than before he went to the hospital at Wenatchee. They testified further that their father on the several occasions when they saw him was incompetent to transact any business. One respondent, when asked if his father knew the extent of his property or who his heirs were in April, 1949, said: "I don't think he knew very much of anything."

The trial court disposed of this conflicting testimony of interested litigants in its oral decision as follows:

"But the Court is in this position: You have this conflict of testimony. You have to try to look to something that is definite and where there isn't any dispute in it, and as the law says in determining a person's mental condition primarily we look to the testimony of the doctors."

The record does not disclose whether the doctor who was called to the ranch had been previously acquainted with the deceased. The doctor did not see him at any time after October 24, 1947, and did not attempt a complete diagnosis of the patient's illness. We quote some of his testimony given at the trial:

"Q. Would you tell us the circumstances of your visit to him? A. Why I was called out there and when I went in the room where he was he was laying there on the cot and seemed to be in a shocked condition. He was confused. He seemed to be very much mentally confused. Rambling in his talk and — Q. Were you at that time, doctor — did you diagnose what his difficulty was? Did you make a diagnosis? A. Well, due to his age I figured he had advanced arteriosclerotic condition and with a probable apoplectic stroke some hours before, leaving him in that condition."

In response to hypothetical questions asked relative to arteriosclerosis and its effect upon the brain, the doctor gave as his opinion that the deceased would not have been competent to make a will at any time after October 24, 1947.

The doctor who cared for the deceased while in the hospital, and who never saw him after November 22, 1947, testified in part as follows:

"At the time I considered that he was—had arterio sclerosis. And certain changes that occur in the brain as a result of arterio sclerosis can be compared to an apoplectic stroke

or what we call aphasic condition, that is, loss of memory—loss of memory for words—and a general irrational condition."

On cross-examination, his testimony was in part as follows:

"MR. MALLOY: And you had no evidence whatsoever of—that he had no stroke, did he? THE WITNESS: Well, he had an attack that we commonly call cerebral softening of a arteriosclerotic basis. MR. MALLOY: What basis is that on? Do you know he had that softening? THE WITNESS: Well, in the first place I stated that he had no paralysis. And if there is very much of any hemorrhage or real stroke, or apoplexy as we call it, apoplectic stroke, cerebral hemorrhage, there is also some nervous disturbances and there is paralysis usually of the facial muscles; of maybe the arms and legs or of some of the controls of the bladder and bowels. Now, he had mental symptoms which indicate arteriosclerosis. In fact you could tell the arteries were markedly thickened. The ones on his radial temple and other arteries that were palpable from the surface, they were markedly thickened and beaded."

In response to hypothetical questions, and after examining the hospital record and death certificate, the doctor gave as his opinion that the deceased was incompetent while in the hospital to make a will and that while he might have had lucid intervals thereafter during which he understood the extent of his property and the natural objects of his bounty, the probabilities were that he did not have such lucid intervals.

The deceased was taken from the hospital to the home of Mrs. Daling on November 22, 1947, where he remained until June 7, 1948. During this perod of time he was largely confined to a wheel chair, although he could walk a few feet around the house by holding onto the wall or articles of furniture. He was to some extent crippled by arthritis. He slept a good deal and read considerably. Two disinterested witnesses, a housekeeper employed by Mrs. Daling and the Daling's hired man, testified that while at the Daling home the deceased improved and appeared to be mentally alert; that he frequently commented upon what he had read in

newspapers and magazines, knew his family and was generally aware of what was going on around him.

Horace Mitchell, testifying against his own pecuniary interest, stated that his father improved during this period, was mentally alert, conversed intelligently and appeared to be of sound mind.

Due to an injury sustained by Mr. Daling, it became impracticable for the deceased to be cared for at the Daling home. A family conference was held and Ethel Heath was selected to care for her father. On June 6, 1947, Mrs. Heath, accompanied by her son, her daughter and son-in-law, drove from her home near Auburn to Mrs. Daling's home near Waterville and, on the following day, they drove with her father back to Auburn. He stayed in her home for the two remaining years of his life.

Mrs. Daling, using her power of attorney to draw on her father's funds, paid her sister ten dollars per day for taking care of him. This was pursuant to an agreement, among Mrs. Daling, Horace and C. B. Mitchell, that Mrs. Heath should be paid that amount. It is disputed whether the deceased was aware that Mrs. Heath was being paid from his funds for her taking care of him.

Within a few days after assuming the care of her father, Mrs. Heath called at the office of an attorney in Auburn, with whom she had had no previous acquaintance and requested that he call on her father, who, she said, desired to make a will. At this time she discussed with the attorney in a general way what her father had told her about his will. She denied having any written memoranda with her when calling at the attorney's office. The attorney called on the deceased and later drew the will now in contest which the deceased executed on June 22, 1948, approximately two weeks after having come to live with Mrs. Heath. He was then ninety-one years of age. The circumstances surrounding the preparation of this purported will and the alleged undue influence exerted by Mrs. Heath in its procurement will be discussed later in this opinion.

The will which is the subject of this contest contained the following provisions relating to the testator's children:

"THIRD: I also declare that the following named children have each received from me property of the reasonable value of $10,000.00 each and are to take nothing by this Will except as hereinafter provided.

"Ralph H. Mitchell — Son — Omak Washington
Horace M. Mitchell — Son — Farmer, Washington
C. Edgar Mitchell — Son — Prineville, Oregon
Clarence B. Mitchell — Son — Farmer, Washington
Cecil F. Mitchell — Son — (Now deceased*)

And do expressly provide that the son of Cecil F. Mitchell, Gale W. Mitchell, my grandson, shall take nothing by this Will except as hereinafter provided.

"FOURTH: I give, devise and bequeath to each of my two daughters, Mrs. Ethel Heath, of Auburn, Washington, and Mrs. Laura Daling, of Douglas, Washington, the sum of Ten Thousand ($10,000.00) Dollars.

"FIFTH: In the event my estate at the time of my death is not of sufficient valuation to pay Ten Thousand ($10,000.00) Dollars to each of my two (2) daughters above-named, then and in that event, all the rest, residue and remainder of my estate shall go to said daughters, Mrs. Ethel Heath and Mrs. Laura Daling, share and share alike.

"SIXTH: In the further event that the valuation of my estate at my death is more than sufficient to pay the two above bequests of Ten Thousand ($10,000.00) Dollars each to my two daughters, Mrs. Ethel Heath and Mrs. Laura Daling, then and in that event, all the rest, residue and remainder of my estate, remaining after payment of the above bequest of $10,000.00 to each of my two daughters herein-above named, I give, devise and bequeath to all of my sons and daughters in this Will named, share and share alike, with the special bequest that my grandson, Gale W. Mitchell, take whatever share his deceased father, my son, Cecil F. Mitchell, might take provided he were living."

The assets of the estate of Charles E. Mitchell were inventoried and appraised in the probate proceeding at $23,-533.37.

Laura Daling was named in the will as executrix, to act without intervention of court. The attestation clause which the witnesses signed, was as follows:

"We, the undersigned, hereby certify and declare that the above instrument, consisting of two other pages besides this one, was signed, sealed, made, ordained, published and

declared by the said Charles E. Mitchell to be his Last Will and Testament and that the said Charles E. Mitchell signed the same in our presence and sight, and we, at his request, signed the same in his presence and sight, and in the presence and sight of each other, as witnesses to his said signature, believing the said Charles E. Mitchell to be of sound and disposing mind and memory and of legal age.

"Dated at Auburn, King County, Washington, this 22nd day of June, 1948."

Mrs. Heath and her husband operated a motor court near Auburn, located alongside the Seattle-Tacoma highway. The deceased occupied a cabin near the office-home of the Heaths. Sharing the cabin with him was a son of the Heaths, a student at the University of Washington. It was the son's opinion, based upon his observation of the deceased, that his grandfather was of sound mind.

Mrs. Heath was a teacher and was away from home during most of the day, except on weekends and during school vacation periods. She employed a woman to care for the deceased during the day as well as to do housecleaning work around the motor court. This witness testified that, shortly after she was employed in September, 1947 [1948] to care for the deceased, he told her that he had made a will and that he wanted whatever he had left to go to his daughters because they were the ones who were taking care of him. On cross-examination, she stated:

"He told me that he had taken care of his sons, and he had fixed it so that his daughters would be taken care of."

This witness testified that the deceased was regularly placed in his wheel chair in the mornings and taken to the Heaths' home for breakfast. She conversed with him for about an hour every morning while she washed dishes and he ate his breakfast. He discussed his children with her, remembered them, commented upon news articles which he had read and referred to topics which he had previously discussed with her. He frequently mentioned his land and his early ranching experience. It was her opinion that he was of sound mind and thoroughly capable of transacting business.

The attorney who drew the will and subscribed it as an attesting witness testified that in his opinion the deceased was competent to make a will. The other attesting witness was the operator of a grocery store next door to the Heaths' motor court. He had seen the deceased on a few occasions when delivering groceries to the Heath home and had exchanged "hellos" with him. He did nothing, prior to attesting the will, to satisfy himself that the deceased was of sound mind. We set forth some of his testimony on cross-examination:

"Q. . . . did you know at the time the Will was executed that he was of sound mind? A. No, I don't. I don't know — I don't know that he wasn't of sound mind. Q. Well, but, as a matter of fact, he could have been incompetent and you would have not known, isn't that right? A. Yes. Q. You never did anything to judge his competency, did you? A. I really didn't know."

The foregoing are the essential facts which relate to the mental competency of the deceased and the execution of the will.

The trial court set the will aside on three grounds:

1. Mental incompetency of the testator.
2. Undue influence exerted by Ethel Heath.
3. Invalidity of the will by reason of the failure of one attesting witness to determine whether the testator had the necessary capacity to make his will.

Appellants' assignments of error challenge each of these grounds.

We shall discuss first the question whether, by reason of the failure of one attesting witness to determine, or make any effort to determine, the testator's mental capacity, the will is *ipso facto* invalid.

There were no witnesses who observed the testator or were present at the time the will was executed other than the two subscribing witnesses. Under these circumstances, does the contested will meet the statutory requirements if there be other competent testimony tending to establish that the testator was possessed of testamentary capacity at the time the will was executed?

Our only statutes bearing upon the question are chapter 193, § 1, p. 591, Laws of 1943 (*cf.* RCW 11.12.010), the applicable part of which reads:

"The following *persons of sound mind,* may, by last will, devise all his or her estate, both real and personal:

"1. Any person who has attained the age of majority. . . ." (Italics ours.)

and RCW 11.12.020, the applicable part of which is:

"Every will shall be in writing signed by the testator or testatrix, . . . and shall be attested by two or more competent witnesses, subscribing their names to the will in the presence of the testator or testatrix by his or her direction or request. . . ."

There is nothing in RCW 11.12.020 which in specific words requires that an attesting witness shall satisfy himself as to the mental capacity of the testator.

The phrase "competent witnesses," as used in statutes relating to the execution of wills, means persons who, at the time they attested, could legally testify in court to the facts which they attest by subscribing their names to the will. *In re Charles' Estate,* 118 Neb. 634, 225 N. W. 869, 64 A. L. R. 1299; *Salyers v. Salyers,* 186 Va. 927, 45 S. E. (2d) 481. They are persons not legally disqualified by reason of mental incapacity, personal interest or conviction of crime, from testifying in courts of justice. *Hiatt v. McColley,* 171 Ind. 91, 85 N. E. 772.

There is nothing in the record to indicate that the subscribing witnesses were not competent.

"Attest" means:

"To bear witness to; to affirm to be true or genuine . . . To witness the execution of a written instrument, at the request of him who makes it, and subscribe the same as a witness. . . ." Black's Law Dictionary (3rd ed.) 166.

See *In re Jones' Estate,* 101 Wash. 128, 172 Pac. 206.

We have, however, said:

"It is the purpose of the statute [RCW 11.12.020] that the witnesses do more than merely sign a paper.

" 'The word "attested" is broader in meaning than the word "subscribed," and it is the purpose of the statute in

requiring two witnesses to attest the will to have more than the mere signatures of two persons to the will. It was the duty of the attesting witnesses, under the statute, to observe and see that the will was executed by the testator, and that he had capacity to execute the will.' *Maxwell v. Lake,* 127 Miss. 107, 88 South. 326." *In re Chafey's Estate,* 167 Wash. 185, 8 P. (2d) 959.

We have also given recognition to the generally accepted doctrine that it is the duty of attesting witnesses to judge the mental capacity of the testator in *Hartley v. Lord,* 38 Wash. 221, 80 Pac. 433, and *Points v. Nier,* 91 Wash. 20, 157 Pac. 44. However, in none of these three cases was the language used necessary to the opinion.

It has often been said that it is the duty of witnesses subscribing a will not only to attest the formal execution of the instrument but the testamentary capacity of the testator as well. 1 Page on Wills (Lifetime Ed.) 636, § 351; 68 C. J. 673, § 316. According to some authorities it has been held with rare exceptions that it is the duty of an attesting witness to observe and judge of the mental capacity of the testator, and satisfy himself of the existence thereof. 57 Am. Jur. 232, § 302. See, also, Anno.: Duty of attesting witness with respect to testator's capacity. 35 A. L. R. 79.

The leading case upon this question is *Scribner v. Crane,* 2 Paige 147 (N. Y.), wherein Chancellor Walworth said:

"No person is justified in putting his name as a subscribing witness to a will unless he knows from the testator himself that he understands what he is doing. The witness should also be satisfied, from his own knowledge of the state of the testator's mental capacity, that he is of sound and disposing mind and memory. By placing his name to the instrument, the witness, in effect, certifies to his knowledge of the mental capacity of the testator; and that the will was executed by him freely and understandingly, with a full knowledge of its contents. Such is the legal effect of the signature of the witness when he is dead, or is out of the jurisdiction of the court. Neither of these witnesses had sufficient knowledge on the subject to give legal evidence of the due execution of his will."

The will there in question was rejected. It appears from the opinion, however, that there was not sufficient evidence

from other witnesses to sustain a finding of testamentary capacity. See, also, *Stevens v. Leonard*, 154 Ind. 67, 56 N. E. 27, 77 Am. St. 446.

In Illinois it is made mandatory by statute that the attesting witnesses testify as to the testator's capacity before a will may be admitted.

We have examined the many cases cited by the text writers in support of the generally accepted doctrine and have found none in which, under similar facts, a will has been rejected because an attesting witness had not judged the testator's capacity.

We agree with the author of the annotation in 79 A. L. R., at page 404, who, writing in 36 Case and Comment, No. 4, p. 7, said:

"Fortunately, this rule is largely innocuous, except in the relatively few cases, hereinafter noted, in which it has been the basis of impeachment of the credibility of attesting witnesses. In the greater number of cases in which this doctrine has been announced, it has been stated either by way of argument or illustration, or to reprimand attesting witnesses who failed to comply therewith. When uttered merely as a rebuke to a witness for a supposed ethical delinquency, the language of the courts on this subject cannot be treated as binding authority; it is merely a dictum reflecting the court's private views on a highly debatable question of ethics, or, more often, an echo of the views of some other court or law writer. . . .

"It was stated above that the majority doctrine is largely innocuous. This statement should perhaps be qualified: it is generally innocuous so long as it is not complied with.
. . .

"It would be much safer and better in every way for the witness, when requested to subscribe to a will, although he doubts that the testator has testamentary capacity, to assume the attitude that he is not qualified to judge of that matter, and has no right to assume to do so, and that if any question is raised thereto by the parties who are concerned with or affected by the will, that question is properly for the determination of the court or jury upon all the evidence."

In the following cases the precise question now before this court was presented and the doctrine was ignored or

its validity denied: *Huff v. Huff*, 41 Ga. 696; *In re James'*
*Estate*, 140 Fla. 463, 191 So. 830; *Mordecai v. Canty*, 86 S. C.
470, 68 S. E. 1049; *In re Zych's Will*, 251 Wis. 108, 28 N. W.
(2d) 316.

In the latter case the court said:

"While it is helpful for an attesting witness to have knowl-
edge of the mental capacity of the person executing a will,
it is not necessary for him to have such knowledge in order
to be competent to sign as a witness."

In *Mordecai v. Canty, supra,* the court said:

"But surely where nothing appears to the contrary, the
witnesses may rely and act upon the general presumption
of sanity and testamentary capacity."

In the present case the attesting witness stated: "He just
seemed sane to me. He didn't act like a man that was out of
his mind."

In the case of *In re D'Avignon's Will*, 12 Colo. App. 489,
55 Pac. 936, the court rejected the doctrine "as a general
proposition."

In *Canada's Appeal from Probate,* 47 Conn. 450, the su-
preme court of errors said that the witnesses to a will need
only be able to testify, after a great lapse of time, that the
testator signed the same paper which they had signed; that
any other benefit derived from requiring witnesses to a
will was only incidental.

It is generally held that the testimony of an attest-
ing witness to a will which tends to show that the testator
was of unsound mind or lacked testamentary capacity is
admissible. See 79 A. L. R. 394. Wills have been sustained
despite such testimony. This fact casts further discredit
upon the doctrine.

Courts have recognized the fact that very few lay wit-
nesses are aware of any supposed duty laid upon them to
certify that the testator is possessed of testamentary capac-
ity, nor do they take any pains to ascertain his mental
soundness. *In re Lambert's Estate*, 166 Ore. 529, 114 P. (2d)
125; *Garrison v. Executors of Garrison*, 15 N. J. Eq. 266. It
is a matter of common knowledge among lawyers that

strangers to a testator are frequently called upon to attest his will.

■ We are of the opinion that while it is highly desirable that one attesting a will should observe and satisfy himself as to the testamentary capacity of the testator, it is not a duty imposed by law, the omission of which renders the will invalid.

■ It is the rule in this state that when a will is offered for probate there must be proof that the deceased was of sound mind when the will was made. *In re Baldwin's Estate*, 13 Wash. 666, 43 Pac. 934; *Higgins v. Nethery*, 30 Wash. 239, 70 Pac. 489.

RCW 11.20.020, relating to the probate of wills, provides in part that

"All testimony in support of the will shall be reduced to writing, signed by the witnesses, and certified by the judge of the court."

■ We recognize that it is the common practice to prove testamentary capacity of the deceased by the testimony of the attesting witnesses. The statute, however, does not limit proof of testamentary capacity to the testimony of such witnesses.

We therefore conclude that the court erred in setting aside the will upon the third ground heretofore mentioned.

This brings us to the factual question: Did Charles E. Mitchell possess testamentary capacity on June 22, 1948, when he executed the will in contest?

If determination of this question were dependent upon which version of conflicting testimony should be accepted as representing the true facts, we should be loath to disturb the trial court's decision thereon.

But a careful consideration of the trial court's oral opinion reveals that in setting the will aside for lack of testamentary capacity the court relied almost entirely upon three factors:

(1) That the testator's statement in his will that each of his sons had received from him property worth ten thousand dollars each was incorrect and was proof that he lacked testamentary capacity.

(2) That the testator's refusal to disclose to the attorney who drew his will the identity and extent of his property was evidence that he failed to comprehend those items.

(3) That the medical testimony as to his mental condition should be controlling where the testimony of the interested parties was in direct conflict.

With reference to (1), above, we have heretofore pointed out that the testator was reasonably justified in considering that he had made gifts worth ten thousand dollars to each of his sons.

With reference to (2), above, the evidence is conclusive that the testator was a positive and determined man. After having told the attorney flatly that he had sufficient property to pay the two legacies to his daughters, he resented any "prying" by the attorney to learn the nature and extent of that property. We are of the opinion that the incident did not justify the weight given it by the trial court.

With reference to (3), above, we believe that the court erred in deciding the issue solely upon the medical testimony, ignoring the testimony of disinterested witnesses and those who testified against their own interests.

We have said that the question of insanity must, *in the main*, be determined by men learned in the medical profession. *In re Torstensen's Estate*, 28 Wn. (2d) 837, 184 P. (2d) 255. But we have recognized also that the testimony of expert witnesses as to insanity, based on hypothetical questions skillfully framed to call for an answer favorable to the party in whose behalf they are asked, is evidence of the weakest and most unsatisfactory character. *In re Miller's Estate*, 10 Wn. (2d) 258, 116 P. (2d) 526; *In re Dennison's Estate*, 23 Wn. (2d) 699, 162 P. (2d) 245.

We are convinced that the testimony of the doctors in this case is not entitled to the great weight given it by the trial court.

There is no definite proof as to how the testator's accident of October 24, 1947, occurred nor as to how long he had lain on the floor of his bedroom in a helpless condition before he was found. He had been living alone. He was cold, in a condition of shock and rambling in his speech. The doctor

who was then called saw him for but a short time early that morning and admittedly did not attempt a full diagnosis. The doctor "figured" that "due to his age . . . he had advanced arteriosclerotic condition and with a probable apoplectic stroke some hours before. . . ."

There is no definite testimony by the doctor who treated the testator in the hospital from October 24 to November 22, 1947, that he had suffered a stroke. We have heretofore set out a portion of this doctor's testimony wherein he tacitly refused to state that the testator had suffered a stroke.

This doctor testified that the testator suffered from arteriosclerosis and that his condition while in the hospital showed evidence of brain softening. The extent to which the testator's mental deterioration had progressed is, as we view the testimony, largely speculative. The doctor admitted that before the testator left the hospital he knew where he was, where he lived and that he wanted to go home. It is evident the testator knew also who he was, and the testimony, taken as a whole, is convincing that he knew his family and what was going on around him. According to the hospital record, the testator, at the time he was admitted as a patient, talked at random but answered questions intelligently. His condition was stated to be "improved" at the time he was discharged.

The only doctor who testified on behalf of appellants had had six months experience treating senile patients at the Oregon State Hospital. He had never seen the testator. He drew attention to the fact that the hospital record gave no indication that the patient had suffered a stroke.

As we understand the testimony of all three doctors, arteriosclerosis, while often closely connected with senile dementia, is, strictly speaking, a disease of the circulatory system. The walls of the arteries become hardened and rigid and calcium-like deposits form upon the inner walls. These obstruct and narrow the opening through which the blood must pass to carry nourishment and oxygen to various parts of the body, including the brain. The supply of blood to the brain may thereby be reduced, and, if the supply is sufficiently impaired over a period of time, there

results a softening of the area of the brain served by the obstructed arteries. Such cerebral softening may cause deterioration of the reasoning powers.

Arteriosclerosis is a common disease, occurring to some extent in most people beyond the age of forty. It is generally progressive, but is not necessarily so. There is no known cure for the disease, but its effect may be compensated·for, to some extent, by adequate nourishment, rest and care. The blood, if rich enough in nourishment, may continue to feed the brain adequately, even though the artery opening, or lumen, has been partially obstructed.

The doctor who saw the testator for but a few minutes on the morning of his accident was most positive in his replies to the hypothetical questions asked, all of which assumed that the testator had suffered a cerebral vascular hemorrhage, or stroke.

The doctor gave as his opinion that the portion of the brain lying beyond the point of hemorrhage is permanently "blacked out" and lost to use. From the fact that the testator's speech was disorganized and that he failed then to recognize anyone, the doctor concluded that the "permanently blacked out area" in the testator's brain was that part which controlled his thinking and reasoning faculties. The doctor therefore gave as his opinion that the testator would not be mentally competent to make a will at any time after October 24, 1947. He further stated that *possibly* thrombi (clots in the arteries) closed the arteries leading to the reasoning area of the brain and caused it to permanently cease functioning.

We think that for two reasons the testimony of this medical witness is entitled to but little weight: (1) He saw the testator only once and for but a short time eight months prior to his execution of the will; and (2) his opinion as to mental capacity of the testator on June 22, 1948, is based upon assumed facts for which we can find no convincing proof in the record.

The doctor who had treated the testator while in the hospital stated his opinion, again given in response to hypothetical questions which assumed that the testator had

suffered a stroke, that he probably would not have lucid intervals to the extent of being able to comprehend the extent of his property and the natural objects of his bounty. This doctor further stated that if the testator did have lucid intervals he would have his good and bad days, but his impaired mental condition as a result of cerebral softening would still be present.

Appellants' medical witness stated it was his opinion, based upon examination of the hospital record, that the testator's illness had been caused by malnutrition. We assume by this that the doctor meant malnutrition of the brain. It was his opinion that the condition could be compensated for to a large degree by proper diet, rest and care.

This witness also stated that old people can suffer from arteriosclerosis to a considerable degree without its affecting their reasoning powers seriously, and that those afflicted with senility arising from arteriosclerosis have transient periods of a week or months when they may be completely rational. His opinion was that it was doubtful, but possible, that the testator's brain might have completely and permanently cleared. He considered it highly probable that the testator would have lucid intervals.

We think that the most that can be said of the medical testimony is that the testator, while in the hospital for a period of about one month, showed some signs of cerebral softening and that its residual effect upon his mental processes is uncertain and to a large extent conjectural.

The testimony of all the disinterested lay witnesses who actually observed the testator after his illness, and of Horace and Ralph H. Mitchell, who testified against their own financial interests, was entitled to great weight. These witnesses were all of the opinion that the testator was of sound mind at the various times they had observed and conversed with him from the autumn of 1947 to the spring of 1950 when his last illness began.

In view of the fact that the medical testimony in this case was given largely in response to hypothetical questions which assumed a state of facts not consistent with

the evidence, we are of the opinion that it should not be allowed to overcome the relevant testimony of disinterested lay witnesses.

The following language, used by the court in *In re Chapin's Estate*, 17 Wn. (2d) 196, 135 P. (2d) 445, is applicable to the case at bar:

"We have given careful consideration to all of the evidence in the case and are convinced that Mrs. Chapin, at the time of the execution of the will of November 13, 1940, understood and fully appreciated what she was doing, and had mental capacity to dispose of her property by will. To hold otherwise would be to disregard the undisputed testimony of many witnesses who were intimately acquainted with Mrs. Chapin and had full opportunity to judge of her mental condition by actual observation and contact with her. The testimony of the numerous expert witnesses that, from her medical history, she should, theoretically, have been incompetent on November 13, 1940, must give way to that of the numerous witnesses who saw and talked with her on that day, and testified that she was not."

■ The right to dispose of one's property by will is not only a valuable right, but one protected by statute; it will be sustained whenever possible. *In re Hamilton's Estate*, 26 Wn. (2d) 363, 174 P. (2d) 301; *In re Martinson's Estate*, 29 Wn. (2d) 912, 190 P. (2d) 96.

■ A person is possessed of testamentary capacity, if at the time he assumes to execute a will, he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty. *In re Bottger's Estate*, 14 Wn. (2d) 676, 129 P. (2d) 518; *In re Torstensen's Estate, supra.*

■ Testamentary capacity is presumed from a will which is rational on its face, and the evidence necessary to set aside a will must be clear, cogent and convincing. *In re Torstensen's Estate, supra.* We are convinced that respondents' evidence in the present case wholly fails to attain that degree of proof.

The trial court, therefore, erred in setting aside the will

on the ground that Charles E. Mitchell lacked testamentary capacity at the time the will in question was executed.

We now consider the trial court's finding to the effect that the will was not that of the deceased but was the will of his daughter, appellant Ethel Heath.

It is not necessary that we set forth here the rules of law pertaining to undue influence exerted upon a testator. Most of them are collected and clearly stated in *Dean v. Jordan*, 194 Wash. 661, 79 P. (2d) 331.

The trial court evidently had these rules in mind when it concluded:

"I

"That the Last Will and Testament of Charles E. Mitchell, deceased, was not the will of the decedent but the will of Ethel Heath, and said will was obtained by the undue influence of Ethel Heath in that:

"(1) Ethel Heath occupied a confidential relationship to the testator;

"(2) Ethel Heath actually participated in the preparation and procurement of the will;

"(3) Ethel Heath received an unnaturally large part of the estate;

"(4) The will was kept a secret from decedent's sons who were as much entitled to know of the wills' execution as decedent's daughters, Ethel Heath and Laura Daling."

In his oral opinion, the court closely related the alleged undue influence and lack of testamentary capacity:

"Now, if you have a man that is sick and infirm—there is no question about that—and with all this factual situation, he was very feeble even not considering his mentality. Certainly the most favorable way you could consider his mentality to be was of a very weak nature due to his sickness and his susceptibility to influence. It seems to me that all the testimony in this case bears out that this was Mrs. Heath's will that Mr. Mitchell signed and I feel that Mr. Mitchell was incompetent at the time, and being in that incompetent condition why of course he would be more easily influenced than he would if he was in a normal condition, and that undue influence was exercised in the procurement of this will."

We have already found from our review of the record, however, that the testator possessed testamentary capacity. Aside from that, the testimony of disinterested persons who had long known the testator and that of the lawyer who drew the contested will was that he was a man of positive character, determined, stubborn, and not easily influenced. Such testimony is difficult to reconcile with a conclusion of undue influence.

There is no doubt that Mrs. Heath occupied a position of confidential relationship to the testator.

With reference to the court's conclusion I(2), quoted above, there is a serious controversy as to the extent of Mrs. Heath's participation in the preparation and procurement of the will. The attorney who drew the will was unable to recall whether he secured the names of the children from her prior to interviewing the deceased, but he stated positively that the deceased gave him the children's names and that he drew the will from notes which he had made at his interview with the deceased, at which Mrs. Heath was not present. He also stated positively that the terms of the will came from the deceased and that after reading the will just prior to his executing it, the deceased stated "that's the way I want it."

Mrs. Heath was not present at the time the will was executed. When she returned a short time afterwards, the testator directed her, in the attorney's presence, to "pay the man his fee for his work." These statements of the testator strongly indicate that the will was his own, and not that of Mrs. Heath.

With reference to its conclusion I (3), quoted above, the court based this upon its belief, stated in the oral opinion, that the declaration in the will that each of his sons, whom he named, had received property from the testator of the reasonable value of ten thousand dollars had been proved to be absolutely incorrect. But, as we have said before, the testator was amply justified in making such a statement in his will.

In view of the testator's belief, which was reasonable,

that neither daughter had been the recipient of substantial gifts during his lifetime, while his sons had received valuable property, we conclude that Mrs. Heath and Mrs. Daling did not receive an unnaturally large share of the estate. In so doing, we have disregarded the testimony of appellants that their father had frequently expressed his concern over his failure to provide for them. The will was a natural one under the circumstances.

The fact that her father had executed a will was revealed by Mrs. Heath only to her sister, although some of the other children visited the testator at Mrs. Heath's home on more than one occasion after June 22, 1948. Mrs. Daling did not reveal this fact until after her father's death, although she had secured possession of the will and knew its contents. She explained this by saying that the will sounded natural to her and "we don't generally go butting around."

The haste with which the will was executed after Mrs. Heath began caring for the testator and her failure to inform her brothers that a will had been made are suspicious circumstances, but mere suspicion of undue influence is not enough to set aside a will. *In re Larsen's Estate*, 191 Wash. 257, 71 P. (2d) 47.

In view of these considerations, we are of the opinion that respondents failed to prove by evidence which was clear, cogent and convincing that the will was obtained by the undue influence of Mrs. Heath. The court, therefore, erred in setting aside the will upon that ground.

From our review of the record, we are convinced that the judgment of the trial court must be, and it hereby is, reversed. The cause is remanded with direction to dismiss respondents' petition.

Since the will is sustained, no award of costs in the superior court may be made to respondents. *In re McKachney's Estate*, 143 Wash. 28, 254 Pac. 455; RCW 11.24.050.

Since respondents appear to have acted in good faith and have made a *prima facie* showing of probable cause for contesting the will, costs in the superior court will not be assessed against them. *In re Chapman's Estate*, 133 Wash. 318, 233 Pac. 657.

Appellants are entitled to recover from the estate their costs and a reasonable attorney's fee to be fixed by the trial court.

Appellants will recover their costs on this appeal.

It is so ordered.

MALLERY, GRADY, HAMLEY, and WEAVER, JJ., concur.

December 9, 1952. Petition for rehearing denied.

