[1] Reported in 211 P.2d 496.
On March 8, 1947, Rosa H. Kessler, then of the age of eighty-one years, executed a will, in which she recited that Mary Antoinette Kessler was her daughter, over the age of twenty-one years, and provided that she should take no part of her estate. By the will, the testatrix gave all of her property to Delia F. Whatmore.
Mrs. Kessler died July 21, 1947. The will was admitted to probate on January 16, 1948. On May 21, 1948, George D. Anderson, in his capacity as guardian of the person and estate of Mary Antoinette Kessler, filed a petition alleging that, on the date of the execution of the will, the decedent was mentally incompetent and acted pursuant to the coercion and undue influence of the beneficiary named in the will. The answer of Delia F. Whatmore denied the charges of mental incompetency, coercion, and undue influence. At the close of the trial, the court orally announced its conclusion that the decedent was mentally incompetent to make a will. The court made no direct finding that the testatrix executed the will pursuant to any form of coercion or was the victim of undue influence, but stated in his oral opinion that there were a number of circumstances and sufficient evidence pointing in that direction.
The court denied a motion for a new trial based upon the statutory grounds and entered a decree that the will was null and void by reason of the mental incompetency of the testatrix to execute such will. The executrix of the will has taken an appeal from the decree.
During the later years of her life, the decedent became afflicted with senility, which is a feebleness of body and mind incident to old age. The authorities refer to the mental breakdown as "senile dementia" and state that it varies both in process and progress of decay; that it begins gradually *Page 158 
and is progressive in character, and in its gradual advance to incompetency it embraces a wide range of infirmity, varying from a simple lapse of memory to complete inability to recognize persons or things.
It does not necessarily result in mental incapacity to make a will. During its progress and before it reaches the stage of mental destruction, the one afflicted has periods of time during which mental balance is regained and to such an extent that he may meet the tests of testamentary capacity adopted by the courts. Being progressive in nature, it must be determined whether its progress has so impaired the faculties of a testator that they fall below the mark of legal capacity. This must be determined not alone by the nature and tendency of the disease, but by its effect in a particular case. Maloy on Nervous and Mental Diseases 350; In re Denison's Estate, 23 Wn.2d 699,162 P.2d 245.
A number of witnesses testified with reference to peculiarities and eccentricities manifested by the decedent and gave their general opinions that she was not normal, showed a progressive mental weakness, appeared to be confused and dazed, and had sullen spells. These witnesses expressed the view that the deceased was mentally incompetent to a degree that made her incapable of transacting her business affairs.
One physician who had observed her on a number of occasions when she visited the hospital for the insane where her adult daughter was confined, considered her incompetent at and about the time the will was made, but stated there were times when she appeared to be alert. This witness testified that at times she had ability to understand suggestions made to her, and at other times she was confused and only partly understood, but explained that if a suggestion pleased her she would accept it, but if not she would probably reject it. Another physician who had considerable contact with the decedent regarded her as generally mentally incompetent, but in response to a hypothetical question as to a certain business transaction in which she had engaged stated that, under the circumstances *Page 159 
related, he would regard her as competent to transact that particular business.
In December, 1946, at the instance of a friend of the decedent, an attorney drew a will, by the terms of which she placed her property in trust for the benefit of her insane daughter during her lifetime. The attorney left the will open as to the residuum of her estate until he could consult her. When visited, the decedent declined to discuss the matter of making the will, was unresponsive to questions asked her, and from the general conversation the attorney concluded she was not competent to make a will. Later, his law partner visited the decedent for the purpose of having the will executed. She visited with him, discussed the view from the place where they were, the boats on the water, etc., but with reference to other matters her attitude of noncommittal was such that he also concluded she did not have sufficient understanding to meet the tests for the making of a will.
There was testimony to the effect that she resented being presented with a will to sign and, as she thought, being told what she should do about making a will. About midday on the date of the making of her last will, the decedent, at the instance of the appellant, visited two lady friends, one of whom was a justice of the peace. The appellant desired to have a will prepared in which she and one of the ladies were to be named as the beneficiaries. The general attitude and apparent condition of the decedent was such that the justice of the peace declined to prepare a will, and the other lady refused to be a party to it in any way.
Not long prior to the making of her last will, the decedent took an active part in the sale of her home property, though she had the assistance of friends. Shortly thereafter, she engaged in a business transaction involving the purchase of other property. There was testimony as to her participation in other affairs of a business nature which she seemed to comprehend. The decedent was deeply interested in the welfare of her daughter, visited her frequently at the mental institution where she was confined, and was very critical as to her diet and what she regarded as the treatment she *Page 160 
was receiving. On several occasions, she indicated to friends her desire that her daughter have the benefit of what property she might have. About the time the will was made, the decedent consulted an attorney in the prosecutor's office. He told the court that for a lady of her age he would say she was very alert and very bright and was fully capable of understanding and transacting her own business.
In the early afternoon of the day of the visit to the justice of the peace, the appellant accompanied the decedent to the office of an attorney. This attorney testified that, in his conversation with the decedent, she told him about her daughter, why she did not want to leave anything to her, and why she wanted to make appellant her beneficiary. He concluded from his conversation with decedent that she was fully competent to make a will and prepared the one now under contest. When the document was prepared, the decedent read it, and then the attorney read it to her and explained to her that she was not leaving any of her property to her daughter, but was leaving it all to appellant and was appointing her to act as executrix of the will without bond. He testified that he was satisfied that she fully comprehended all that was discussed between them. He was corroborated in these respects by the subscribing witnesses to the will. Sometime after making the will, this attorney prepared an assignment of real-estate mortgage for the decedent, which she executed and acknowledged.
[1, 2] We have decided that where a will, rational on its face, is shown to have been executed in legal form, the law presumes testamentary capacity of the testator, that the will speaks his wishes, and in order to overcome such will, the evidence must be clear, cogent and convincing. We have adopted as a test of testamentary capacity that, at the time the will is executed, the testator must have sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty. Dean v.Jordan, *Page 161 194 Wn. 661, 79 P.2d 331; In re Schafer's Estate, 8 Wn.2d 517, 113 P.2d 41; In re Bottger's Estate, 14 Wn.2d 676,129 P.2d 518; In re Denison's Estate, 23 Wn.2d 699,162 P.2d 245; In re Torstensen's Estate, 28 Wn.2d 837,184 P.2d 255.
[3] Our review of the record brings us to the conclusion that the decedent had periods of time when she did have testamentary capacity, and that the proof submitted on the question of lack of such capacity at the time the will was made is not of the character to justify setting it aside.
Upon the question of undue influence, we find that decedent had two classes of friends: those solely interested in her general welfare, and who, in so far as they considered what testamentary disposition she should make of her property, conveyed the thought to her that her daughter should be the beneficiary by way of a trust; those who were also interested in her welfare, but each of whom desired to become a beneficiary in any will she might make to the complete exclusion of her daughter. When decedent contracted to purchase property in conjunction with a friend, the latter was to make the monthly payments and also make a home for decedent and her daughter when she secured her release from the hospital. The plan of appellant was that she would make a home and care for decedent, and this she did for some time. There is evidence to the effect that decedent resented some of such showing of benevolence. One will was executed by decedent in which both of these friends were named as beneficiaries to the exclusion of the daughter. On the day the last will was made appellant sought to have it provide that she and another party would be the beneficiaries. When this failed, appellant took decedent to an attorney of her own choosing. She was named as sole beneficiary. At all times when a trust was suggested, appellant objected.
[4, 5] While we have concluded that the evidence does not establish want of testamentary capacity at the time the last will was executed, we are of the opinion that, owing to the physical and mental condition of decedent, she was *Page 162 
much more susceptible to influence by those to whom she was grateful than a normal person would ordinarily have been. It appears very clear to us that appellant set about to and did take advantage of the condition of the decedent, and that the will disregarding the daughter was the creature of appellant and the will decedent executed spoke only the intent and desire of appellant. In the case of In re Martinson's Estate, 29 Wn.2d 912, 190 P.2d 96, we said:
"Legal definitions of the term `undue influence' cannot be given that will serve as a safe and reliable test for every case. Each case depends to a very large extent upon the facts presented to the court. However, not every influence exerted over a person can be denominated undue influence. Generally speaking, influence exerted by means of advice, arguments, persuasions, solicitations, suggestions, or entreaties, is not undue influence, unless it be so importunate, persistent, or coercive, or otherwise so operates as to subdue and subordinate the will of the testator and take away his freedom of action. [Citing cases.]
"From the very nature of cases of undue influence, the evidence is mainly circumstantial, so that a liberal scope of investigation is allowable. Undue influence is not usually exercised openly in the presence of others so that it can be directly proved, but the circumstances relied upon to show it must be such as will, if taken together, point unmistakably and convincingly to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter and not the former.
"In order to have a will set aside on the grounds that its execution was produced by undue influence, it must be shown that the influence exerted was such as overcame the will of the testator. To put it in other words, the influence must have destroyed the free will of the testator so that the will spoke the intent and desire of the one exerting the influence, and not the intent and desire of the testator. [Citing cases.]"
The statement of facts in this case contains over 1,500 typewritten pages and numerous exhibits. We see no purpose in discussing the large volume of evidence on the subject of undue influence. We have examined the entire record and are convinced that the mind of the testatrix *Page 163 
was subjected to the will of the appellant, that the influence to make the will went far beyond mere advice or suggestions and became the moving factor which caused the testatrix to disinherit her invalid daughter and name the appellant the sole beneficiary.
[6] We have decided that, even though a judgment of a trial court is based upon a theory which an appellate court may deem erroneous, if there is sufficient evidence in the record to support the judgment on some other ground or reason such judgment will, nevertheless, be affirmed. State ex rel. Spokane etc. Bankv. Justice Court, 189 Wn. 87, 63 P.2d 937.
The judgment is affirmed.
SIMPSON, C.J., MALLERY, SCHWELLENBACH, and DONWORTH, JJ., concur.
January 26, 1950. Petition for rehearing denied.
SIMPSON, C.J., dissents. *Page 164