[No. 2018-2.  Division Two.  January 20, 1977.]

*In the Matter of the Estate of* FIDEL H. ESALA.
MARY FRANCES ZUMWALT, *Respondent, v.* RUTH N. MORGAN, ET AL, *as Executrices, Appellants.*

*Bernard J. Heavey, Jr.,* for appellants.

*Hugh A. Knapp* and *Knapp, O'Dell & Pinkerton,* for respondent.

PETRIE, C.J.—Fidel H. ("Bill") Esala executed two wills during the last 18 months of his life. The first, signed on March 27, 1973, named Mary Frances Zumwalt of Kansas City, Missouri, as his sole beneficiary and executrix; the second, signed in the hospital on September 21, 1974, omitted mention of Mary Zumwalt and named Ruth N. Morgan and Florence E. Dean as sole joint beneficiaries and joint executrices of the estate. Ruth Morgan and Florence Dean appeal from an order revoking the probate of the second will and admitting the prior will to probate. The trial court determined that the second will was invalid due to the undue influence of Morgan and Dean upon the testator. A secondary issue, raised by Zumwalt, is whether the Superior Court properly awarded attorney's fees and costs to Morgan and Dean despite the fact they had not posted a bond as coexecutrices. We affirm both orders.

Resolution of this appeal essentially requires a determination of whether the evidence supports a finding of undue influence. We note that a contestant has the burden of

proving the illegality of a will admitted to probate. RCW 11.24.030.

■ ■ The elements of undue influence have been skillfully defined by the late Chief Justice Steinert in *Dean v. Jordan*, 194 Wash. 661, 671-72, 79 P.2d 331 (1938) as follows:

> To vitiate a will there must be something more than mere influence. There must have been an undue influence at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice. . . .
>
> The evidence to establish fraud or undue influence must be clear, cogent, and convincing. . . .
>
> Nevertheless certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as [4] the age or condition of health and mental vigor of the testator, [5] the nature or degree of relationship between the testator and the beneficiary, [6] the opportunity for exerting an undue influence, and [7] the naturalness or unnaturalness of the will. The weight of any of such facts will, of course, vary according to the circumstances of the particular case. Any one of them may, and variously should, appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will.
>
> The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient to overthrow the will.

(Citations omitted.) *See also In re Estate of Burkland*, 8 Wn. App. 153, 504 P.2d 1143 (1972).

We turn, then, to examine the evidence in view of the factors set forth in *Dean* and applied by this court in *Burk-*

*land. See also In re Estate of Smith*, 68 Wn.2d 145, 411 P.2d 879, 19 A.L.R.3d 559 (1966). The trial judge, who had the opportunity to evaluate the credibility of the witnesses, expressly found the existence of all seven considerations stated by Chief Justice Steinert; not all of the factors are necessary to raise a presumption of undue influence.

1. The express finding is that Ruth Morgan occupied a fiduciary relationship with the decedent "during at least the last six months" of his life. The parties have suggested the definition of a fiduciary relationship contained in Black's Law Dictionary 753 (4th ed. rev. 1968):

> An expression including both technical fiduciary relations and those informal relations which exist whenever one man trusts and relies upon another. . . . It exists where there is special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to interests of one reposing the confidence.

(Citations omitted.) Under this broad definition, substantial evidence supports the finding. The testator lived in an apartment building which Mrs. Morgan and her husband owned and also occupied. She helped Mr. Esala with his business affairs by mailing insurance premium checks for him and sometimes prepared checks to creditors for his signature. She arranged the transfer of funds from one of Esala's savings accounts to another. She knew the location of his will and other valuable papers and his cash. She testified that Esala put a good deal of trust in her during the last several months of his life.

2. There is strong evidence of both Mrs. Morgan's and Mrs. Dean's active participation in the preparation, procurement, and execution of the contested will. During his terminal illness the testator was admitted to Skyline Hospital in White Salmon, Washington, on September 18, 1974. On September 20, Mrs. Morgan entered Esala's apartment and removed his 1973 will to her own apartment, where she read it. She then tore up this will. (After vigorous questioning, she recanted prior testimony that she had not torn it, and admitted tearing it into two pieces.) Early the next

morning, a Saturday, she called the home of Robert Salvesen, an attorney, and obtained an immediate appointment with him to prepare a new will for Esala. Mr. Salvesen also drew the 1973 will. He testified that Mrs. Morgan brought him the 1973 will torn into numerous pieces "so small that one had to do a jigsaw puzzle on it before one could read it." She instructed Mr. Salvesen to name her and Mrs. Dean the executrices and sole beneficiaries of the new will. He called Mrs. Dean to get her correct middle initial and delivered the will to Mrs. Morgan that morning. She and Mrs. Dean took the will to the hospital that afternoon, where Mrs. Dean summoned two nurses to Esala's room to witness his signature. He did not read the will in the nurses' presence. Either Mrs. Morgan or Mrs. Dean pointed out to the testator where to sign the will.

3. The challenged beneficiaries received all of the estate, which would not necessarily be unusual or unnatural of itself inasmuch as they cared for him and socialized closely with him during his last years, and he had no wife or blood relatives as natural objects of his bounty. However, for years Mary Zumwalt had been a natural object of his bounty. She was Esala's brother's stepdaughter, and he often referred to her as his "niece." She had known him for many years since her Missouri childhood. They had exchanged letters, telephone calls, and gifts regularly over the years, and he had stayed with her on visits to Kansas City—as many as seven during the previous 10 years. She was the sole heir under his first will. A good friend of the decedent testified that Esala told him repeatedly, including one occasion only a month prior to his death, that his "niece," Mary, would get all his property. In these circumstances, the court could properly have found that the second will bequeathed an unusually and unnaturally large portion of the estate to Mrs. Morgan and Mrs. Dean.

4. The testamentary capacity per se of the testator is not challenged. Although he was 75 years old, was terminally ill with cancer for which he had been previously hospitalized in August 1974, had a serious heart condition, and was

under medication in the hospital, he was reported to have been alert and rational at the time he signed the contested will. The medications could have caused him a loss of memory and power to reason but, according to his physician, did not appear to have done so. Nevertheless, the hospital records show that during the days and hours prior to execution of the will, Bill Esala was in considerable pain, perspired profusely, got progressively weaker, and was very restless. Indeed, only a few hours following execution of the will, he had a severe episode of arrhythmia and died 24 hours later. Thus, despite the testator's reported lucidity during the execution of the will, there are ample indications that his advanced age and weakened physical condition were such as to have made him *susceptible* to undue influence.

5. There is no question that the testator, although not related to Mrs. Morgan or Mrs. Dean, was the recipient of much care and attention from them during the last several months of his life. He ate meals with them; Mrs. Morgan helped him with business affairs; he stayed with the Deans following a heart attack late in 1973, and Mrs. Dean made sure he took medicines as scheduled. Bill Esala was best man at the Morgans' wedding. However, Mary Zumwalt had stronger and more affectionate ties of long standing to the testator and was viewed by him as his only relative.

6. Certainly there was evidence of opportunity for the proponents to unduly influence the testator. Bill Esala lived in the Morgans' apartment building the last 4 years. In addition to the frequent contacts between Esala and the proponents we have described, they visited him often in the hospital.

7. The "unnaturalness" of the will is reflected in its inconsistency with the testator's prior will and his intent, expressed only a month prior to his death, to leave all his property to Mary Zumwalt.

The fact that substantial evidence was presented to raise a presumption of undue influence under the test of *Dean v. Jordan*, 194 Wash. 661, 79 P.2d 331 (1938) is not determina-

tive, however. The proponents contend that they came forward with evidence sufficient to destroy the presumption. They stress the strong personality and apparent testamentary capacity of the testator; the testimony of a friend, Enos Cornwall, that Esala told him just prior to execution of the will on September 21 of his intention to change his will in favor of Mrs. Morgan and Mrs. Dean; and his purported overall plan to leave his insurance policies to Mary Zumwalt, his automobile to the Morgans (to whom he also executed a transfer of title the day before his death), and the balance of the estate to Mrs. Morgan and Mrs. Dean.

This case is another striking example of the wisdom of the rule that the trial court, having the witnesses before it, is in a better position to arrive at the truth than is the appellate court. *See In re Estate of Dand*, 41 Wn.2d 158, 247 P.2d 1016 (1952).

Assuming that the ravages of cancer and the resultant medication had not diminished Bill Esala's faculties, evidence of testamentary capacity is not inconsistent with the conclusion that undue influence had overmastered free agency. The trial court, within its prerogative, disbelieved some of the testimony of Mrs. Olson, an employee and tenant of the Morgans who had nearly married Mrs. Morgan's son. Her testimony that Bill Esala had expressed disappointment with Mary Zumwalt a month prior to his death was contravened (1) by another witness' statement that his friend, Esala, said, at about the same time, that he loved Mrs. Zumwalt, that he wanted her to remain his heir, and that he did not "get along too well with Mrs. Morgan"; (2) by the testimony of Ruth Morgan herself, who admitted that Esala had directed her to notify Mary Zumwalt in case of an emergency and who acknowledged that she had not done so until 2 hours prior to his death despite the apparent imminence of death for several days; and (3) by the testimony of Nurse Whitecotton, who testified that she spoke with Mrs. Zumwalt by telephone after execution of the second will and that Esala seemed pleased when told

Mary had just heard of his hospitalization and was on her way to visit him.

Other than Mrs. Olson's testimony, which did not persuade the trial court, there is no indication until the day before the testator executed the second will that he intended to substitute Mrs. Morgan and Mrs. Dean as his legatees in place of his beloved niece. On the contrary, there are strong appearances that Mrs. Morgan, and to a more passive extent, Mrs. Dean, used their close relationship with the dying gentleman to induce him to change his will at the last minute, destroyed the former will, and then hastily procured the new will, the witnesses, and his signature. The motive underlying these events is confirmed by Mary Zumwalt's testimony relating the telephone call from Ruth Morgan only 2 hours before Bill Esala expired on the evening of September 22:

> this is when Mrs. Morgan told me that there wasn't any need for me to come up [to Washington] because *she and Florence Dean had him change his Will* and that I was left completely out of it, and there was no need for me to come because there was nothing I could do about it, and I told her at the time it didn't make any difference about the will. I said, "I was coming up to pay my respects to my uncle; he's passing away and this is where I belong".

(Italics ours.)

This uncontradicted account, although self-serving for Mrs. Zumwalt, is the only direct evidence of the proponents' interference with the free will of the testator. However, undue influence is rarely provable by direct evidence. *In re Estate of Tresidder*, 70 Wash. 15, 125 P. 1034 (1912). The other evidence is entirely circumstantial, and relates to motive, opportunity, the disposition contrary to the testator's prior intent, and his execution of the will in a weakened condition. In addition, the record indicates a destruction of the 1973 will by Mrs. Morgan, who reluctantly acknowledged that act. We hold that there is substantial evidence to support the trial court's determination that undue influence was established by clear, cogent, and convincing evidence. Accordingly, we affirm the order revok-

ing the probate of the second will and admitting to probate a copy of Fidel H. Esala's will of March 27, 1973.

Finally, we turn to the trial court's denial of Mary Zumwalt's motion to vacate an order allowing attorneys' fees and costs to be assessed against the estate in favor of the proponents of the contested will. Mrs. Zumwalt's claim of error is based solely upon the undisputed fact that Mrs. Morgan and Mrs. Dean did not file a fidelity bond as required by the trial court's order dated January 30, 1975, which had initially admitted to probate the 1974 will and confirmed Morgan and Dean as coexecutrices of that will. Mrs. Zumwalt does not challenge the good faith of the coexecutrices in defending the will. Nor does she challenge the reasonableness of the amount of the fee.

RCW 11.24.050 governs the assessment of costs and attorney fees in will contests. Under definitive decisions interpreting that statute, the duty of the executor is to take all reasonable steps to uphold the testamentary instrument. As long as he does so in good faith, he is entitled to an allowance out of the estate for his costs and reasonable attorney fees necessarily incurred by him, regardless of whether or not he is successful in his defense against the contest of the will. *In re Estate of Reilly*, 78 Wn.2d 623, 479 P.2d 1, 48 A.L.R.3d 902 (1970); *In re Estate of Kleinlein*, 59 Wn.2d 111, 366 P.2d 186 (1961).

The 1974 will provided that no bond shall be required. We will assume, without deciding, that RCW 11.28.185 (which became effective October 1, 1974) grants the court authority to require filing a fidelity bond despite the testator's direction to the contrary. In the case at bench, the trial court concluded that the duty of the coexecutrices to defend the will was apparent despite "their failure to technically qualify." We agree. Their duty to defend sprang from their nomination as coexecutrices in the will; the cloak of authority initially granted by the court to administer the estate was superfluous in this regard.

Judgment affirmed. Respondent is awarded costs on appeal.

REED, J., and RUMMEL, J. Pro Tem., concur.