977 P.2d 591 (1999)
95 Wash.App. 358
In the Matter of the ESTATE OF Lavina A. KESSLER,
Thomas and Frances Trimm, Appellants,
v.
Brian and Tami Davis, Personal Representatives of the Estate of Lavina Kessler, Respondents.
No. 40992-1-I.
Court of Appeals of Washington, Division 1.
March 1, 1999.
Publication Ordered April 30, 1999.
*594 Kenyon E. Luce, Christopher M. Constantine, Tacoma, Charles A. Burgeson, Seattle, for Appellants.
Carol S. Vaughn, Michael T. Schein, Douglass A. North, Maltman, Reed, North, Ahrens & Malnati, Seattle, for Respondents. *592
*593 AGID, A.C.J.
Frances and Thomas Trimm appeal the trial court's order denying their petition to invalidate the 1996 Will of Lavina Kessler. The Trimms contend that the trial court erred in concluding they did not come forward with clear, cogent and convincing evidence of lack of testamentary capacity, undue influence, fraud and improper execution. They also contend that the trial court erred in finding that they acted without probable cause and good faith in contesting the will on those grounds. Because we defer to the trial court's assessment of the credibility of the respective witnesses, we conclude that there is sufficient evidence to support its findings that the Trimms were unable to meet the applicable standard of proof. As counsel for Brian and Tami Davis herself conceded at oral argument, however, the Trimms presented a compelling case. For that reason, we hold that there is no basis for concluding that the Trimms acted without probable cause or in bad faith in contesting the will. We reverse the trial court's award of attorney fees to the Davises but affirm its conclusion that Lavina Kessler's 1996 will was valid.

FACTS
Lavina Kessler, who was born in Canada in 1896, died in Washington on May 24, 1996, at the age of 99. Frances and Thomas Trimm, now 83 and 84 years old themselves, had been friends of Lavina's for approximately 50 years at the time of her death. Over the years Lavina had looked to them for assistance in various matters, especially after her eyesight began to fail. The Trimms took her to the doctor, paid her bills and managed her financial affairs. They also ran errands, did occasional shopping, provided other personal services, and arranged for care. When Lavina was hospitalized with a broken hip in April 1993, she executed a power of attorney appointing Mrs. Trimm as her attorney-in-fact. Lavina began to receive visiting nurse services and home health care that year. In 1987, 1990, 1993 and 1995, Lavina Kessler made four wills.[1] In each of *595 those wills she made substantial bequests to the Trimms.[2]
In mid-December 1995, Almyra Butler, one of Lavina Kessler's tenants who helped her with cooking and cleaning, was forced to stop providing care because of her own physical problems. On December 14, Frances Trimm found Lavina on the floor of her Renton residence and took her to the doctor. Dr. Graves advised them that it was no longer safe for Lavina to live alone, but Lavina was adamant that she would not go to a nursing home. Because the Trimms were personally unable to provide 24-hour care, Dr. Graves contacted Adult Protective Services to see what other arrangements could be made.[3] When they learned about Lavina's situation, two other friends of Lavina's, Greg and Sherry Schroeder, contacted Lavina's great-nephew, Brian Davis, who lived in Idaho with his wife, to express concern about the way in which the Trimms were handling Lavina's affairs.
Brian and Tami Davis arrived unannounced on December 16. On December 18, Tami Davis contacted Lawrence Warren, Lavina's attorney, and told him Lavina wanted to revoke her power of attorney. Tami complained to Warren about the care Lavina was receiving from the Trimms. She also told him that the Trimms were trying to discharge William Cavender, Lavina Kessler's accountant since 1967, in order to get control of her financial affairs. And she told him that the Trimms were trying to sell some of Lavina's assets including a piece of real property on Camano Island. Because it was Lavina Kessler who was his client, Warren explained he would need to speak with her. When he met with Lavina at her home that afternoon, however, he could not determine whether she recognized him or whether she was capable of executing a testamentary instrument. He was unable to conduct a meaningful dialogue with her except to ascertain that she was greatly agitated at the thought that she might be put in a nursing home. Although she appeared somewhat better during a second interview on the morning of December 19, he was again unable to communicate with her enough to reach any conclusion regarding her testamentary capacity. Warren was never asked to meet with Lavina again.
On December 29, Tami Davis contacted attorney John Hertog and asked him to meet with Lavina Kessler at her home to assist in revoking the power of attorney.[4] Hertog *596 met with Lavina at her home the following day to discuss revoking any existing powers of attorney and preparing a new power of attorney appointing Tami Davis as attorney-in-fact.[5] He testified at trial that when he asked Lavina why she wanted to revoke the power of attorney, she told him the Trimms had not done right by her and she no longer trusted them. Lavina also told him they had not kept her informed about how her assets were being managed and that she feared they were going to try to put her in a nursing home. The record also reflects that Tami Davis gave Hertog a copy of Lavina Kessler's 1995 will. He read it to Lavina that day but went no further at that time.
On January 3, Hertog again met with Lavina Kessler so she could execute the documents he had drafted following the December 29 meeting. Hertog's partner, Barbara Coster, was also present. During the January 3 meeting, Hertog asked Lavina if she knew what the Trimms had done with her investments. She responded that she had gotten "a notice on the tv" that they had taken her money and "done something with it." Lavina was convinced that she had far fewer funds than she had back in 1993. She told Hertog that the Trimms "didn't go ahead and look after thelook after me and look after things. They justthey just looked after themselves." Because Lavina appeared unable to understand what would happen as a result of revoking the power of attorney, Hertog concluded the meeting without having her execute the documents he had prepared.[6]
On January 4, the Davises filed a petition to establish a limited guardianship for Lavina Kessler. Hertog was appointed by the court to represent Lavina in that guardianship, and Julie Schisel was appointed guardian ad litem. When Julie Schisel met with Lavina on January 11, she was again confused at times. When Schisel asked her to describe her whereabouts, for example, Lavina insisted she was living in Seattle and that her Renton home had been closed up, even though the interview took place in the Renton home in which she had lived for 50 years. Lavina also told Schisel that, while she did not want to make accusations, she believed the Trimms had "deposited her funds differently." But she explained she had to take Tami Davis's word for it because she could no longer see well enough to read and relied on Tami to read her mail for her. When Schisel met with Lavina a second time on January 12 to discuss ownership of certain properties, Lavina was able to tell her she had stocks, mutual funds and some bank accounts, but was unable to describe the extent of her assets. Lavina also told Schisel that she owned the Bennett Apartments and that the Bennett Grocery had been sold. In fact, the Bennett Apartments had been sold 15 years earlier; the Bennett Grocery remained an asset of hers and was being operated as Arnold's Market.
On January 5, 1996, the Davises filed a petition for a temporary restraining order against the Trimms, declaring they had substantial cause to believe that Lavina Kessler would suffer serious and immediate physical harm if a temporary restraining order was not entered. Based on their declarations and that of Gregory Schroeder,[7] the court issued *597 a temporary restraining order forbidding the Trimms from going within 100 yards of Lavina Kessler's person and within two blocks of her home. On January 17, the Trimms stipulated to an agreed order which prohibited them from exercising control over Lavina Kessler's assets. It also required them to schedule visits in advance but did not require that the Davises be present when they visited with Lavina.
On February 27, the court entered an order in the guardianship proceeding establishing a limited guardianship. Because Tami Davis had told Julie Schisel, the guardian ad litem, that she would contest Lavina Kessler's last will if it was not changed, Schisel recommended the appointment of a professional guardian for the estate.[8] The court appointed Guardianship Services of Seattle limited guardian of Lavina Kessler's estate. Guardianship Services of Seattle and Tami Davis were appointed co-limited guardian of Lavina Kessler's person. Tom Curtiss, who investigated the allegations against the Trimms for Adult Protective Services, testified at trial that he found "no inkling" of any abuse or exploitation of Lavina by the Trimms. The court's finding that there was no evidence that the Trimms had misappropriated funds is unchallenged by either side.[9]
On March 22, 1996, Lavina Kessler signed a new will. The will signing was recorded on videotape after those present rehearsed the transaction.[10] The videotape reflects considerable confusion on Lavina's part about the nature and consequences of what was taking place. When Hertog asked her at the beginning of the discussion whether she had decided how she wanted her estate to be distributed after her death, Lavina replied, "That thatI don't know. I don't think I did diddiddiddid that." She was able to recall that she had made wills on prior occasions. But when Hertog asked her whether she had described how she wanted her estate to be distributed in those wills, she responded, "But thatI don't know what Iit's so long that I done it that II've kind of forgotten what was in it." Lavina also repeatedly expressed concern about whether gifts would take effect in the present or only in the future "if I pass away." And she expressed confusion about her relationship to several beneficiaries and former family members. When asked what her husband's name was, she responded "Bill Kennedy"-not the name of anyone to whom she had ever been married. When asked to describe what her estate consisted of, Lavina was able to tell Hertog only that "[i]t's worth quite a little bit."
Lavina also expressed confusion about her intentions toward the Trimms. When first asked about whether she still wanted to make the gift of real property to the Trimms described in her 1995 will, she twice said she did "not want to change that." It was only when Hertog repeated the question yet again that she said she did not want to give them the property. When Hertog asked her about a $10,000 bequest to them in the new will he had drafted, she told him she was not going to do that "[b]ecause they took me so bad I *598 don't." But later in the conversation, when he asked her whether anyone managed her financial affairs before Tami did, she replied, "I don't think so, no." Hertog then asked Lavina whether the Trimms had ever managed her financial affairs and she responded that they had at one time but "they don't do it no more, haven't done it for a long time."
When Hertog explained at the conclusion of their discussion about the 1995 will that it was the will she signed on February 2, 1995, Lavina said:
A. Well, then itlet it stand that way.
Q. And did you want to make any changes in that will?
A. No, I don't think there's anything.
After Lavina Kessler signed the 1996 will, Hertog explained it would be her last will and testament and would be substituted for the will she signed in February 1995. Lavina responded "[h]uh?" and then "[o]h." The 1996 will eliminated all gifts to the Trimms in Lavina's 1987, 1990, 1993 and 1995 wills and named Tami Davis a beneficiary for the first time. It also, for the first time, made gifts of real property to Brian and Tami Davis and named them as residuary beneficiaries.
Lavina Kessler died nine weeks later on May 24, 1996. The will she signed on March 22 was admitted to probate on July 11, 1996, and the Davises were appointed as personal representatives. On October 3, the Trimms filed this action contesting the 1996 will. Their complaint alleged that Lavina Kessler lacked testamentary capacity when she signed the 1996 will on March 22; Lavina was unduly influenced by Tami Davis in making the will; Tami Davis fraudulently induced the will; and it was improperly executed. At the conclusion of a two-week trial, the trial court denied the Trimms' petition to invalidate the 1996 will and entered an order awarding costs and attorney's fees to the estate in the amount of $346,949.89.[11] It denied motions by the Trimms to correct findings of fact and to amend judgment.

DISCUSSION

I. Standard of Review
The Trimms challenge nearly 50 of the trial court's factual findings, arguing that they are not supported by substantial evidence in the record. The Trimms also contend that the trial court erred in concluding that they did not prevail on their claims of lack of testamentary capacity, undue influence, fraud and improper execution. And they contend that the trial court erred in finding that they acted without probable cause and good faith in bringing those claims. To avoid unnecessary repetition of the pertinent facts, we have discussed both aspects of their argument as it relates to each claim in the same section below.
Findings of fact will be upheld on review if they are supported by substantial evidence in the record.[12] Where there is conflicting evidence, the reviewing court need only determine whether the evidence most favorable to the responding party supports the challenged findings.[13]

II. Probable Cause and Good Faith
The Trimms challenge the trial court's award of costs and attorney fees to the estate based on its conclusion that the Trimms acted in bad faith and without probable cause in contesting Lavina Kessler's 1996 will. RCW 11.24.050 provides for the assessment of costs and attorney fees against will contestants unless the contestants "acted with probable cause and in good faith."[14] The *599 trial court explained that, in its view, the question whether a contestant acted in good faith and with probable cause must be evaluated in light of the clear, cogent and convincing standard of proof a contestant must meet to prevail at trial.
While the Davises contend that the trial court correctly stated the pertinent legal test, neither they nor the trial court has cited any authority for this proposition.[15] Not only are we unaware of any authority that supports the imposition of a higher legal standard to the determination of whether a will contestant, as contrasted with any other civil litigant, acted in good faith, but we agree with the Trimms that to tie the elements of good faith and probable cause to a will contestant's ability to satisfy the burden of proof at trial is, in effect, to construe the statute as a "prevailing party" attorney fee statute.[16] In In re Estate of Chapman, the Supreme Court explained "where a person in good faith brings an action to contest a will and makes a prima facie case, attorney's fees should not be awarded against him in the event his action fails."[17] Our Supreme Court has also held that where a case involves a close question of fact, "it clearly should not all within [RCW 11.24.050]."[18] Thus, in considering the question whether the Trimms acted in good faith and on probable cause in contesting the will in the specific context of each of their claims below, we have treated that question and the question whether they prevailed on the merits as two distinct questions. To do otherwise "would be to do a great wrong and tend to discourage the assertion of legitimate claims."[19]

III. Testamentary Capacity
The Trimms contend that the trial court erred in concluding that they did not have probable cause to contest Lavina Kessler's will based on lack of testamentary capacity, and in failing to find that Lavina Kessler lacked testamentary capacity.[20] In order to execute a valid will,
the testator must have sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty.[[21]]
"`Failure of memory is not alone enough to create testamentary incapacity, unless it extends so far as to be inconsistent with the `sound and disposing mind and memory' requisite for all wills.'"[22] While testamentary capacity is determined as of the time the will is made, evidence related to the testator's mental condition during a reasonable time *600 before and after the making of the will is relevant and admissible even if remoteness affects its weight.[23] Courts have held, however, that a radical departure from a prior testamentary scheme supports an inference that the later will is the product of an unsound mind.[24]
The Trimms assign error to various findings of fact related to the issue of testamentary capacity. In particular, they challenge the trial court's findings that the videotape of the will signing is "persuasive and compelling evidence" that Ms. Kessler had testamentary capacity; they knew her treating physician had expressed the opinion that Lavina was able to understand the purpose and effect of a will on March 22, 1996; he had not diagnosed any mental deficiency other than mild to short term memory loss; Lavina was aware of the parcels of real property listed in the will; the confusion Lavina exhibited during her January 3 meeting with Hertog was not evident during the March 22 will signing; visiting nurse records demonstrate that Lavina Kessler was almost always alert and oriented; and Brian Davis had been named as a beneficiary under Ms. Kessler's wills dating back to 1965.
The Trimms are correct in observing that there is evidence in the record which contradicts these findings. Even the Davises concede that two of the findings are simply wrong. First, they concede that the trial court erred in finding that Brian Davis had been an heir since 1965. In fact, the record reflects that he, like the Trimms, has been an intended beneficiary under Lavina Kessler's wills only since 1987. Second, they concede that it erred in finding that Dr. Graves testified that Lavina Kessler was capable of understanding the purpose and effect of a will on March 22, 1996.[25]
We also agree with the Trimms that the trial court erred in finding that the confusion Lavina exhibited in the January 3 meeting with Hertog was not evident during the March 22 will execution. As described above, Lavina exhibited considerable confusion during the will signing about whether the gifts she was making were to take effect in the present or in the future. She also exhibited confusion about her relationship to a number of beneficiaries and other relatives. While that confusion was generally cleared up with Hertog's assistance, the repeated instances of confusion raised a genuine issue with regard to whether she was able to "recollect the objects of [her] bounty."[26]
There was also a genuine question about whether she was able to comprehend the nature and extent of the property in her *601 estate.[27] When Lavina was asked to describe what her estate consisted of, all she was able to say was "it's worth quite a little bit." She was, however, able to state that if she died her estate was large enough to cover all the bequests she had made. That was sufficient to establish that she was generally able to comprehend the nature and extent of her property at the time she made the 1996 will. The errors we discussed above were significant, but do not change this result.
While we conclude, after careful consideration of all the evidence in the record, that Lavina Kessler did not lack testamentary capacity when she signed the will on March 22, 1996, the question is a close one.[28] For that reason, we disagree with the trial court that the Trimms acted in bad faith and without probable cause in contesting the will based on lack of testamentary capacity.

IV. Fraudulent Representations
The Trimms also contend that the trial court erred in concluding that they did not have probable cause to contest Lavina Kessler's 1996 will based on fraud and that they did not prove by clear, cogent and convincing evidence that the 1996 will was induced by Tami Davis' fraudulent representations.
RCW 11.24.010 permits an interested person to file a claim that a will was pro-cured by fraud within four months following probate of the will.[29] If it can be shown that the will was induced by fraudulent representation of a person benefiting from the will, the will may be set aside.[30] In order for the will to be set aside, however, all the elements of fraud must be shown by clear, cogent and convincing evidence.[31]
The Trimms argue that findings related to fraudulent inducement are not supported by substantial evidence. In particular, they contend that the trial court erred in finding (1) "[d]iscovery failed to reveal any false representations by Tami Davis to Lavina Kessler;"[32] and (2) there was "no evidence that Tami Davis ever discussed ... the Trimms with Lavina Kessler."[33] We agree that these findings are not supported by substantial evidence. In her February 1996 report to the court in the guardianship proceeding, Julie Schisel, the guardian ad litem, described the following conversation with Lavina during their first meeting on January 11:
I asked Ms. Kessler if she had any concerns about the actions of Mr. and Mrs. Trimm under the power of attorney. She said that she thought ["]the funds didn't go right. I think they got kind of mixed up. I don't want to accuse." I asked if there was anything specific they had done that was of concern to her. She said, "My funds have been deposited differently. I have to take Tami's word for it because I can't read and Tami reads my mail to me."
*602 I asked her if she thought any of her money was missing and she stated that she didn't know. She confirmed that she had asked Mr. and Mrs. Trimm to take care of her business affairs in the past, saying that she figured that they were honest people.
During her January 3 meeting with Hertog, Lavina also expressed the belief that the Trimms "had taken my money." And at the time she executed the 1996 will, Lavina continued to believe the Trimms "took [her] so bad" and stated that as her reason for changing her will. The record further reflects that Tami Davis made similar statements to others within 48 hours of her arrival, and that she continued to make such statements in February and March. For example, Susan Traub, the hospice nurse who looked after Ms. Kessler in February and March, testified Tami Davis told her the Trimms had sold some of Lavina Kessler's property and were going to build a house somewhere. While Tami's statements to others are not in themselves evidence of what she told Lavina, they do suggest that she made similar statements to Lavina. Taken together with Tami's statement to the guardian ad litem that she would contest the will if it were not changed and Lavina's admission that she relied on Tami for information about how the Trimms handled her money, they support an inference that Tami Davis led Lavina to think the Trimms misappropriated her funds and "took [her] so bad" for the purpose of persuading her to change her will.
While this evidence was clearly sufficient to support the inference of fraudulent inducement by Tami Davis, the fact remains that there was no direct evidence of what Tami actually told Lavina. The same confusion that made Lavina vulnerable to fraudulent misrepresentations also made it difficult for her to explain precisely what Tami told her and how she reached the conclusion that the Trimms had not acted according to her wishes. The record does reflect that Lavina Kessler was also genuinely grateful to Tami Davis for the care she provided during the last months of her life, especially because she believed it allowed her to avoid being put in a nursing home.
In the circumstances, we agree with the trial court that the evidence adduced at trial was insufficient to allow the Trimms to prevail on this issue under the clear, cogent and convincing standard.[34] Again, its errors with respect to the underlying facts do not change the result. There was, however, more than enough evidence to allow the Trimms to go forward with their claim. As such, there is no basis for finding that they acted without probable cause or good faith in contesting the will on this ground.

V. Undue Influence
The Trimms next contend that the trial court erred in concluding that they did not have probable cause to contest Lavina Kessler's will based on undue influence and that they failed to prove by clear, cogent and convincing evidence that the 1996 will was the product of undue influence.
The will of a person who otherwise possesses testamentary capacity may be set aside upon a showing that a beneficiary exercised undue influence over the testator.[35] As the Lint court explained, the undue influence which operates to void a will must be something more than mere influence alone. Rather, it must be influence which
at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice.
... influence tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will.[[36]]
*603 Evidence to establish undue influence must be clear, cogent and convincing.[37] The Lint court noted that despite the "rather daunting burden" placed on will contestants, a presumption of undue influence can be raised by showing certain suspicious facts and circumstances:
[C]ertain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relation-ship between the testator and the beneficiary, the opportunity for exerting an un-due influence, and the naturalness or the unnaturalness of the will[.]
The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient to overthrow the will.[[38]]
The existence of the presumption imposes upon the proponents of the will the obligation to come forward with evidence that is at least sufficient to balance the scales and "`restore the equilibrium of evidence [regarding] validity of the will.'"[39] But it does not relieve the contestants from the duty of establishing their contention by clear, cogent and convincing evidence.[40]
In Lint, the Supreme Court upheld the trial court's finding of undue influence. The factors it considered included the near-constant presence of the person alleged to have unduly influenced the testator, the exclusion of friends and family, and the fact that the individual in question enlisted the assistance of a new attorney and fired the testator's prior estate-planning attorney.[41] The haste with which a will was executed after a beneficiary newly included in the will arrived is also a factor courts have considered in determining that there were grounds to suspect undue influence.[42]
The Trimms again challenge several of the trial court's factual findings, in particular its findings that (1) Tami Davis "did not participate in any way in ... the hiring of Mr. Hertog;"[43] and (2) Tami Davis did not have a confidential or fiduciary relationship with respect to Lavina Kessler's estate.[44] In fact, the record reflects that Tami Davis was involved in hiring Hertog. It was she who first contacted him to ask him to meet with Lavina about revoking her existing power of attorney and who provided him with a copy of Lavina's 1995 will the first time he met with her. There is also no question that *604 she occupied a fiduciary or confidential relation to the testator even before her appointment as co-limited guardian.[45] The record is clear that Lavina Kessler was extremely aged and subject to severe bouts of short-term memory loss and confusion.[46] Finally, it is true that, as a result of the changes to the 1996 will, Tami Davis and her husband Brian stand to receive the bulk of her $2.4 million estate, a result that directly contravenes the testamentary scheme reflected in Lavina Kessler's four previous wills.[47]
These facts were clearly sufficient to establish a presumption of undue influence. But we agree with the trial court, even after taking the factual errors into account, that they are not enough to establish "influence tantamount to force or fear" on the part of Tami Davis. Her actions were not sufficient to overcome Lavina Kessler's free will to the point that they prevented her from exercising her own judgment or choice.[48] There is no basis, however, for concluding that the Trimms acted in bad faith in contesting the will based on undue influence.

VI. Execution of Will
The Trimms also argue that the trial court erred in concluding they did not have probable cause to contest Lavina Kessler's 1996 will on the ground that it was not properly executed, and in finding that they failed to prove improper execution by clear, cogent and convincing evidence. They assign error to the following findings, arguing that they are not supported by substantial evidence:
Finding of Fact 1.10. The [Trimms] presented no evidence at trial to support the claim of improper execution.
Finding of Fact 80 (portion). The witnesses [Mr. Hertog, his law partner Barbara Coster, and their legal assistant Anne Galt] signed the Will in the presence of Mrs. Kessler on March 22, 1996, and at a later date signed an Affidavit of Attesting Witnesses.[[49]]
The formal requirements for the execution of a will are set out in RCW 11.12.020, which provides in pertinent part:
Every will shall be in writing signed by the testator or by some other person under the testator's direction in the testator's presence, and shall be attested by two or more competent witnesses, by subscribing their names to the will ... in the presence of the testator and at the testator's direction or request ...
The statute does not require that the testator sign the will in the presence of the witnesses or that the witnesses sign in the presence of each other.[50] It does, however, require that the witnesses subscribe their names in *605 the presence of the testator and at her direction or request.[51]
The Trimms argue that they had probable cause to contest the 1996 will on the ground it was improperly executed because the videotape of the will signing does not show the witnesses to the will signing their names in Lavina Kessler's presence or at her direction. Given that the affidavit of the attesting witnesses states that they signed the will in Lavina's presence immediately after she signed the will, the videotape's failure to reflect the entire transaction certainly raises questions. As much at issue as her testamentary capacity was whether Lavina Kessler had the presence of mind to direct or request witnesses' signatures.
But Hertog testified at trial that after the video camera was turned off, Lavina said "she wanted us to act as witnesses to her Last Will and Testament." Coster testified that she could not "remember exactly" whether Lavina Kessler personally asked the witnesses to sign her will but she was sure she did. This testimony and the affidavit sworn by the three witnesses to the will provide sufficient evidence to support the trial court's finding that the witnesses signed the affidavit in the presence and at the request of Lavina Kessler. Given the curious circumstances, however, we disagree the trial court that the claim was so clearly without merit that the Trimms lacked probable cause or good faith in contesting the will on this basis.

VII. Admissibility of Expert Testimony
Finally, the Trimms contend that the trial court abused its discretion in denying their motion to exclude the testimony of James Leverenz, M.D., on the ground that his name was not timely disclosed. Their attorney conceded at trial that Dr. Leverenz was disclosed as a potential rebuttal witness on April 25, 1997, the date established for the disclosure of rebuttal witnesses in the April 14 case scheduling order. But he argued that Dr. Leverenz should have been designated as a primary witness and, therefore, his name should have been disclosed on April 15, the date established for the disclosure of primary witnesses. The Davises explained that Dr. Leverenz was identified as a rebuttal witness in response to the Trimms' designation of Dr. Seth Cohen as an expert on the subject of dementia. King County Local Rule 26(c) defines rebuttal witnesses as "all persons whose knowledge did not appear relevant until the primary witnesses were disclosed." In light of the Davises' explanation of their reason for designating him as a witness, we conclude the trial court did not abuse its discretion in denying the Trimms' motion to exclude Dr. Leverenz' testimony.

VIII. Attorney Fees and Costs
The Davises contend that the estate is "entitled" to its attorney fees on appeal on the ground that the Trimms raised no debatable issues about which reasonable minds could differ. As is clear from our discussion above, even though the Trimms did not prevail, they raised a number of valid and debatable issues concerning the result in this case. We therefore decline to award the Davises their attorney fees on appeal. Because we conclude that the Trimms did not act in bad faith or without probable cause in contesting the 1996 will, we also reverse the trial court's award of attorney fees to the estate.[52]
Affirmed in part and reversed in part.
NOTES
[1] The attorney who drafted the 1987, 1990, 1993 and 1995 wills for Lavina Kessler was Lawrence Warren, also City Attorney for the City of Renton. She was introduced to Warren by Thomas Trimm, who had met him during his 32 years as a Renton City Councilman. Lavina Kessler's second husband was at one time the Renton police chief.
[2] The 1987, 1990, 1993 and 1995 wills follow the same general testamentary scheme. The 1987 will leaves Lavina's nephew, Wesley Davis, real property and leaves his son, Brian Davis, $50,000. It forgives Lee Bennett, a nephew by marriage, a $20,000 debt for a loan made to him to open a veterinary clinic. It leaves Carol Goodner $20,000 and leaves various other, more distant relatives gifts of $2,500 to $5,000. And it leaves three pairs of friends, including the Trimms and the Schroeders, specific parcels of real property. All three pairs of friends are named as residuary beneficiaries, and the Trimms are nominated as personal representatives.

The 1990 will leaves Wesley Davis $75,000 instead of the real property and leaves Brian Davis $40,000 together with the funds in a United Mutual account. It makes a new gift of real property to Wesley and the Trimms in equal shares and names Wesley and the Trimms as residuary beneficiaries. The other provisions remain essentially the same.
The 1993 will leaves Wesley Davis (who by that time was in very poor health) $100,000 and provides that, if he should predecease Lavina, that share should go to his wife. This be-quest replaces all the previous provisions she had made for him. The other provisions remain essentially the same, except that the Trimms become sole beneficiaries of the parcel of real property they would have shared with Wesley Davis under the previous will and sole residuary beneficiaries.
The 1995 will is virtually the same as the 1993 will except that it provides that if Wesley Davis predeceases Lavina Kessler, his wife will receive just $10,000. By the time the 1996 will was made, Wesley Davis had died.
[3] Dr. Graves' testimony refers to "we" placing the call to Adult Protective Services on the day the Trimms were in his office, suggesting, contrary to what the Davises imply, a cooperative effort to identify alternatives. The Trimms' explanation for their failure to immediately hire full-time nursing care is that Lavina repeatedly insisted that she wanted to maintain her independence and resisted spending money on having someone there 24 hours a day.
[4] Hertog received a faxed copy of the power of attorney from attorney Carol Vaughn later on the day that Tami Davis first contacted him. When he spoke with Carol Vaughn the same day, he learned that Tami Davis had contacted Suzanne Howle, her partner, about setting up a guardianship for Lavina Kessler. Suzanne Howle and Carol Vaughn also represented Tami Davis in filing the petition for a temporary restraining order and are the attorneys for the estate in this appeal.
[5] During this meeting, Tami Davis was in the kitchen next to the room where Hertog met with Lavina. Although the door was closed, Hertog admitted that he had to speak quite loudly for Lavina to hear.
[6] Although the Davises suggest it was the Trimms' arrival during the meeting that was responsible for Lavina's confusion, the audiotaped record of the conversation reflects that she made both the comment about receiving a message over the television and those indicating confusion about the consequences of signing the revocation before they arrived.
[7] In his declaration, Schroeder stated that he believed Lavina Kessler retained little or no knowledge of her financial affairs. Schroeder, who is in his 40s, also described the Trimms as "extremely intimidating." At trial he admitted there had been tension between himself and the Trimms on various occasions over the years. Tom Curtiss of Adult Protective Services testified at trial that Gary Schroeder had "this big conspiracy theory" that the Trimms were obtaining powers of attorney from other elderly people in order to obtain "their inheritance." After investigating the allegations against them, Curtiss found no evidence of such activity on the part of the Trimms.
[8] Although she did not include it in her report, this statement was recorded in Schisel's notes of her conversation with Tami Davis after the guardianship petition was filed. Schisel did report to the court that Lavina told her that the Trimms had never threatened or been mean to her, had never touched her in a way she did not like, and she was not afraid of them. Lavina told Schisel she wanted to continue to visit them and to maintain her friendship with them, that the Trimms no longer visited because they did not get along with Tami, and that she understood that the temporary restraining order had been entered because of problems between Tami and the Trimms, and not between the Trimms and herself.
[9] William Cavender, Lavina Kessler's accountant since 1967, testified that he had no information that any information provided to him by the Trimms was false, inaccurate or mis-leading, or that they took or misused any assets or property belonging to Lavina Kessler. He also described Frances Trimm's record keeping as "fastidious." A power of attorney appointing William Cavender attorney-in-fact was executed on January 23, 1996.
[10] Kathryn Azous, a companion caregiver, testified that Tami Davis listened to trans-action via a monitor upstairs in the home. The trial court, however, found that her testimony was not credible.
[11] The trial court awarded costs and attorney fees in the total sum of $348,652.39. In addition to the $346,749.89 awarded at the conclusion of trial, the court awarded $1,242.50 for fees related to the Trimms' motion to amend judgment and $660 for fees related to the Trimms' motion to correct findings of fact.
[12] In re Estate of Lint, 135 Wash.2d 518, 531, 957 P.2d 755 (1998).
[13] Id. (citing Miller v. Badgley, 51 Wash.App. 285, 753 P.2d 530, review denied, 111 Wash.2d 1007 (1988)).
[14] See In re Estate of Kubick, 9 Wash.App. 413, 420, 513 P.2d 76 (the fact that suit contesting a will is brought on advice of counsel compels the conclusion that the petition was made in good faith and for probable cause so long as the facts were fully and fairly laid before counsel), review denied, 83 Wash.2d 1002 (1973).
[15] See, e.g., State v. Hensler, 109 Wash.2d 357, 359, 745 P.2d 34 (1987) (arguments not supported by citation to authority need not be considered); State v. Young, 89 Wash.2d 613, 625, 574 P.2d 1171, cert. denied 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978) (courts may assume that, where no authority is cited in support of a proposition, "counsel, after diligent search, has found none").
[16] In re Estate of Vaughn, 137 Wash. 512, 518, 242 P. 1094 (1926), cited by the trial court in support of its conclusion that RCW 11.24.050 "reflects the Legislature's intent that it is proper to tax the costs of a will contest against an unsuccessful claimant who `presented the issues and caused the expense of the trial.'" But Vaughn is also a case where the contestant abandoned claims of undue influence and fraudulent representations at trial and where her contention that the 64-year-old decedent lacked testamentary capacity failed when it was shown that he had ably attended to his business as a banker up to the day he made his will in anticipation of an operation he was to undergo the following day and was able to recite from memory the correct property description for 28 different tracts of land he owned in different counties. Vaughn, to say the least, is clearly distinguishable from the case before us.
[17] 133 Wash. 318, 322, 233 P. 657 (1925).
[18] In re Estate of Hastings, 4 Wash.App. 649, 653, 484 P.2d 442 (1971).
[19] In re Estate of Eichler, 102 Wash. 497, 500-01, 173 P. 435 (1918).
[20] The Davises concede, however, that the trial court erroneously concluded that testamentary capacity is a question of law and not a question of fact. See Conclusion of Law 4.
[21] In re Estate of Wiltzius, 42 Wash.2d 149, 151, 253 P.2d 954 (1953); In re Estate of Kessler, 35 Wash.2d 156, 160, 211 P.2d 496 (1949).
[22] In re Estate of Denison, 23 Wash.2d 699, 714, 162 P.2d 245 (1945).
[23] See In re Estate of Gwinn, 36 Wash.2d 583, 591, 219 P.2d 591 (1950).
[24] In re Estate of Landgren, 189 Wash. 33, 38, 63 P.2d 438 (1936) ("In considering testamentary capacity at any particular date, it is proper to consider the previously expressed wish of the alleged testator.")
[25] On February 2, 1996, Dr. Graves stated that there was a "slow but definite deterioration of her mentation" such that Lavina was not able to be cognizant of the overall picture insofar as her financial affairs were concerned, even though she was still able to provide input. In their petition for limited guardianship, the Davises themselves declared Lavina was "incapable of asserting her rights or of making decisions in her best interests without a great deal of assistance." Lint, 135 Wash.2d at 532, 957 P.2d 755. On February 13, 1996, Dr. Graves advised Julie Schisel o his opinion that Lavina lacked the mental capacity to give informed consent to medical treatment. On July 31, 1996, in response to an inquiry by the Trimms' attorney, Dr. Graves explained it was his opinion that:

because of her short-term memory failing she did not show sound judgment regarding her living situation. Regarding her capacity for managing her own financial affairs, her input would have been helpful in that respect, but her short-term memory would preclude her consistently knowing where her funds were going. In this respect, it is difficult to know whether she was aware of all the nuances of making and executing a will.
We reject the Davises' argument that this error is of no significance because it was supported by the testimony of "many other witnesses." The standard for determining whether a finding which states that a particular individual made a certain statement is supported by substantial evidence is not that there may have been others who made similar statements. Even if such statements were made, moreover, what others thought cannot substitute for the opinion of the treating physician.
[26] See Kessler, 35 Wash.2d at 160, 211 P.2d 496.
[27] Id.
[28] As the Davises concede, the question whether Lavina Kessler had the capacity to make a will is an issue of fact, not of law. See In re Estate of Johanson, 178 Wash. 628, 629, 35 P.2d 52 (1934). The trial court's understanding that testamentary capacity is "a conclusion of law for the court to make" is in error. See Conclusion of Law 4.
[29] Lint, 135 Wash.2d at 533, 957 P.2d 755.
[30] Id.
[31] Id. The elements of fraud are (1) representation of an existing fact; (2) materiality of the representation; (3) falsity of the representation; (4) knowledge of the falsity or reckless disregard as to its truth; (5) intent to induce reliance on the representation; (6) ignorance of the falsity; (7) reliance on the truth of the representation; (8) justifiable reliance; and (9) damages. Id. n. 4 (citing Farrell v. Score, 67 Wash.2d 957, 958-59, 411 P.2d 146 (1966)).
[32] Finding of Fact 1.6.
[33] Finding of Fact 1.17. The Trimms also assign error to other factual findings including Finding of Fact 1.14 ("It was also made known to the Trimms prior to the filing of the Will contest that Lavina Kessler's interests had been protected by Guardianship Services of Seattle, nurses, and many family members and friends, all of whom visited frequently and oversaw the actions of Tami Davis.") But the limited guardianship was not established until February 27, 1996, after Tami Davis had already lived with Lavina Kessler for over two months. Thus, establishing the guardianship does not resolve the question whether there was undue influence prior to that time.
[34] See Estate of Pfleghar, 35 Wash.App. 844, 847, 670 P.2d 677 (1983) (to meet the clear, cogent and convincing standard, the ultimate fact in issue must be shown by the evidence to be "highly probable") (quoting In re Sego, 82 Wash.2d 736, 739, 513 P.2d 831 (1973)), review denied, 100 Wash.2d 1036 (1984).
[35] Lint, 135 Wash.2d at 535, 957 P.2d 755 (citing Dean v. Jordan, 194 Wash. 661, 79 P.2d 331 (1938)).
[36] Id. (quoting In re Estate of Bottger, 14 Wash.2d 676, 700, 129 P.2d 518 (1942)).
[37] Id. (citing In re Estate of Mitchell, 41 Wash.2d 326, 249 P.2d 385 (1952)).
[38] Id. at 535-36, 957 P.2d 755 (quoting Dean, 194 Wash. at 671-72, 79 P.2d 331).
[39] Id. (quoting In re Estate of Smith, 68 Wash.2d 145, 154, 411 P.2d 879, 416 P.2d 124 (1966)).
[40] Id.
[41] Id. at 537, 240 P. 192.
[42] In re Estate of Mitchell, 41 Wash.2d 326, 353, 249 P.2d 385 (1952) (within a few days after assuming the care of her father, a daughter who, together with her sister, had been excluded under prior wills in which he divided his estate only among his sons, called the office of an attorney and requested that he call on her father who, she said, wanted to make a new willthat will divided his estate among all his children including the girls).
[43] Finding of Fact 1.13. The Trimms also assign error to Finding of Fact 39 (Tami Davis did not retain Hertog or procure his services for Lavina Kessler).
[44] Conclusion of Law 21 states in its entirety:

Although Tami Davis was Lavina's fiduciary, as co-guardian of her person, Tami Davis never occupied a confidential or fiduciary relationship with respect to Lavina Kessler's estate. Lavina Kessler's assets and financial affairs were never part of Tami Davis' responsibilities. Guardianship Services of Seattle managed Lavina's estate and reviewed Tami's actions as co-limited guardian of the person.
[45] See In re Estate of Esala, 16 Wash.App. 764, 767, 559 P.2d 592 (1977) (fiduciary relationship existed where testator lived in same building as caretaker who was his beneficiary, relied on her for help in his daily affairs, and placed great trust in her during the last months of his life); Mitchell, 41 Wash.2d at 352, 249 P.2d 385. Not only was Tami Davis co-guardian of Ms. Kessler's person, but she was in a position similar to that of the daughter in Mitchell about whom the court observed there was "no doubt that [she] occupied a position of confidential relationship to the testator."
[46] See Lint, 135 Wash.2d at 535-36, 957 P.2d 755.
[47] Id.
[48] See Lint, 135 Wash.2d at 535, 957 P.2d 755.
[49] Hertog, Galt and Coster signed an affidavit of attesting witnesses on May 28, 1996, four days after Lavina Kessler's death. RCW 11.20.020(2) permits any or all of the attesting witnesses to make an affidavit "stating such facts as they would be required to testify to in court to prove such will." The affidavit may be made at the time the will is executed or after the death of the testator. In re Estate of Ricketts, 54 Wash.App. 221, 223, 773 P.2d 93 (1989). While RCW explains how to validly execute a will, RCW 11.20.020(2) explains how to prove it for probate. Id. at 224, 773 P.2d 93. The affidavit of attesting witnesses signed here provides in pertinent part:

SIGNATURE, ATTESTATION AND SUBSCRIPTION: Immediately following Testatrix's declaration, Testatrix signed and published such instrument as her Last Will, in the presence of each of the undersigned, and then each f the undersigned, as witnesses, at Testatrix's request, subscribed our names thereto in the presence of Testatrix and of each other.
[50] Id. at 225, 294 P. 528 (quoting In re Estate of Chambers, 187 Wash. 417, 425, 60 P.2d 41 (1936)).
[51] Id.
[52] The Trimms correctly observe that, in its original order, the court cited RCW 11.96.140 as the basis for its award of costs and attorney fees. In its order denying the Trimms' motion to amend judgment, however, it cited both RCW 11.96.140 and RCW 11.24.050 as bases for its award of fees. The Davises make no attempt to defend the trial court's award of attorney fees based on RCW 11.96.140. Because they have effectively conceded that RCW 11.96.140 does not provide a basis for an award of fees in this action, we have considered only the question whether the award of fees was justified under RCW 11.24.050.